186 P.3d 1170 (2008)
STATE of Washington, Respondent,
v.
Glen Arthur SCHALER, Appellant.
No. 25919-6-III.
Court of Appeals of Washington, Division 3.
July 3, 2008.
*1172 Tanesha La Trelle Canzater, Attorney at Law, Bellingham, WA, for Appellant.
Felecia Shay Chandler, Okanogan County Prosecuting Attorney, Okanogan, WA, for Respondent.
KORSMO, J.
¶ 1 Glen Arthur Schaler, crying and hysterical, called Okanogan Behavioral Health Care and reported he had been having dreams he killed his neighbor and was covered in blood. After law enforcement responded to Mr. Schaler's residence and determined no crime had occurred, Mr. Schaler was transported to the hospital for a mental health evaluation. Tonya Heller-Wilson spent four hours evaluating Mr. Schaler at the hospital, during which time he repeatedly stated he wanted to kill his neighbors. When Ms. Heller-Wilson asked Mr. Schaler if he was serious, he specifically stated he wanted to harm his neighbors. Ms. Heller-Wilson informed the neighbors, Kathy Nockels and Denise Busbin, of the threats. Both neighbors had previously obtained protection orders against Mr. Schaler. Mr. Schaler was charged with two counts of felony harassmentthreats to kill. The case proceeded to a jury trial, where the jury was instructed on the definition of "threat," and "knowingly threaten," but not on the definition of a "true threat." Mr. Schaler was found guilty as charged. We hold the failure to instruct the jury on the definition of "true threat" was error, although under the specific facts presented here, the error was harmless. Further, the evidence presented to the jury was sufficient to establish Mr. Schaler's statements were "true threats." Accordingly, we affirm the convictions.

FACTS
¶ 2 On August 10, 2005, at approximately 11:00 a.m., Mr. Schaler called Okanogan Behavioral Health Care, and stated he thought he just killed his neighbor and he needed to speak to someone. The phone call was transferred to Ms. Heller-Wilson, the Director of Crisis Services. Mr. Schaler, crying and hysterical, told Ms. Heller-Wilson he had been having dreams he killed his neighbor by slitting her throat. He stated he woke up covered in blood, and he was "very, very scared." After a few minutes of conversation with Mr. Schaler, Ms. Heller-Wilson asked a co-worker to call 911. When the police arrived at his residence, Mr. Schaler hung up the phone; however, Ms. Heller-Wilson was able to resume telephone contact with him shortly thereafter.
¶ 3 Deputy Connie Humphrey of the Okanogan County Sheriff's Office responded to the 911 call. Upon arrival at Mr. Schaler's residence, she pounded on the front door and heard a male voice tell her to go away. Deputy Humphrey again attempted to get Mr. Schaler to come to the door; eventually he opened the door and handed her the phone. Deputy Humphrey took the phone and spoke to Ms. Heller-Wilson. She asked Deputy Humphrey to transport Mr. Schaler to Mid-Valley Hospital in Omak for evaluation if the situation did not develop into a criminal investigation. Ms. Heller-Wilson also informed Deputy Humphrey she had faxed a pick up order[1] for Mr. Schaler. After speaking to Ms. Heller-Wilson, Deputy Humphrey went to the residence of Mr. Schaler's neighbors, Larry and Denise Busbin. Deputy Humphrey was unable to contact anyone at the residence, but she did not *1173 observe any signs of violence. Subsequently, additional law enforcement officers arrived as backup. They determined Larry Busbin was out of town and Ms. Busbin had been seen leaving for work earlier that morning.
¶ 4 Mr. Schaler agreed to let Deputy Humphrey transport him to Mid-Valley Hospital. Upon arrival at the hospital, Deputy Humphrey left Mr. Schaler with Ms. Heller-Wilson, who had come to the hospital to meet them.
¶ 5 Ms. Heller-Wilson spent approximately four hours evaluating Mr. Schaler at the hospital. During this time, Mr. Schaler told Ms. Heller-Wilson he wanted to kill his neighbors, eventually identified as Kathy Nockels and Larry and Denise Busbin, "with his bare hands, by strangulation." He told her he had been thinking about it for months. Ms. Heller-Wilson described Mr. Schaler's demeanor when he made these statements as angry. She asked Mr. Schaler whether he was serious:
I can't recall specifically how I asked him. I, I know that you don't, it's part of my job to try to keep people out of the hospital. And when people tell me that they feel like they want somebody to die, or they want to die, I always go into the explanation that you know, there are times that I wish I were dead, but I don't have a plan to kill myself. I mean, you know, there are just times, and there's times that I wish my, my boss didn't exist, but I don't have a plan to kill him. And I kind of went that way, and I said, "You know, sure, you might wish that they weren't there. Maybe you're [sic] life would be a little bit easier." But he said specifically, he wanted to harm them.
At no time did Mr. Schaler tell Ms. Heller-Wilson his statements were not serious. Furthermore, Ms. Heller-Wilson asked him, more than once, whether he really meant what he had said. According to Ms. Heller-Wilson:
I was seeing, I was in and out of the room. Danny Lockwood was sitting with [Mr. Schaler] directly the whole time, and he has to get medical clearance, and they're drawing blood, and doing all this stuff. And so, I'm kind of in and out, you know, giving him some time to chill, to make sure that maybe you know, you know, get some of this energy out of him. And so, yeah, back and forth, trying to say, "You know, how are you feeling? You doing better now? You doing better now?" And he, he said it several times.
Subsequently, Ms. Heller-Wilson informed both Ms. Nockels and Ms. Busbin of the threats made by Mr. Schaler.
¶ 6 Mr. Schaler was charged with two counts of felony harassmentthreats to kill, in violation of RCW 9A.46.020(1)(a)(i) and (2)(b). Ms. Nockels was named as the alleged victim in count one, and Ms. Busbin was named as the alleged victim in count two. Mr. Schaler filed a motion to suppress the statements he made to Ms. Heller-Wilson in her capacity as a mental health professional, and a motion to dismiss the charges pursuant to State v. Knapstad, 107 Wash.2d 346, 729 P.2d 48 (1986). The court denied both motions.
¶ 7 The case proceeded to a jury trial. On cross-examination, Ms. Heller-Wilson stated it was Mr. Schaler who made the initial phone call, in part conveying a dream, and his purpose in calling was to ask for help. Also on cross-examination, Ms. Heller-Wilson indicated Mr. Schaler confided in her he wanted to kill Ms. Nockels and Ms. Busbin, and that he thought about it.
¶ 8 The jury also heard testimony regarding the relationship between Mr. Schaler and Ms. Nockels and Ms. Busbin, prior to August 10, 2005. Ms. Nockels testified on the morning of June 1, 2005, she observed Mr. Schaler cutting, with a chainsaw, several fruit trees that stood between her home and Ms. Busbin's home. Ms. Nockels testified she telephoned Ms. Busbin and 911 to report this incident. Ms. Busbin testified she was at work when she received Ms. Nockels' phone call, and she left work and came home. She further testified when she arrived home, she observed Mr. Schaler cutting a tree with a chainsaw. She testified she responded by calling 911. Both Ms. Nockels and Ms. Busbin testified they obtained protection orders against Mr. Schaler, on the same day as this incident.
*1174 ¶ 9 Deputy Michael Blake of the Okanogan County Sheriff's Office testified he came into contact with Mr. Schaler on July 23, 2005, while responding to a harassment complaint. He testified Mr. Schaler made "some specific statements regarding the association with him and his neighbors." Mr. Schaler also told Deputy Blake, "[i]t was obvious that somebody [is] going to die," but clarified "he felt he was the one that was going to die." Deputy Blake also testified he spoke to Ms. Nockels and Ms. Busbin on that same date.
¶ 10 At the close of the State's case, defense counsel moved to dismiss, arguing the evidence was insufficient to establish Mr. Schaler knowingly threatened another person with bodily harm. Specifically, defense counsel argued the evidence did not establish Mr. Schaler subjectively intended to communicate a threat. The court denied the motion. Subsequently, the defense rested.
¶ 11 Jury instruction 10 defined "threat," stating "[t]hreat means to communicate, directly or indirectly, the intent to cause bodily injury immediately or in the future to the person threatened or to any other person." Instruction 12 instructed the jury, "[a] person threatens `knowingly' when the person subjectively intends to communicate a threat." Defense counsel did not object to this instruction. The court did not give, nor did the parties request, a jury instruction defining a "true threat." The jury found Mr. Schaler guilty as charged. He appealed.

ANALYSIS
¶ 12 The first issue here is whether the jury was properly instructed. On appeal, instructional errors are reviewed de novo. State v. Brett, 126 Wash.2d 136, 171, 892 P.2d 29 (1995), cert. denied, 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). A jury instruction must correctly state the applicable law. State v. Mark, 94 Wash.2d 520, 526, 618 P.2d 73 (1980). "Jury instructions are sufficient if they allow the parties to argue their theories of the case, do not mislead the jury and, when taken as a whole, properly inform the jury of the law to be applied." Hue v. Farmboy Spray Co., 127 Wash.2d 67, 92, 896 P.2d 682 (1995).
¶ 13 In general, an objection to a jury instruction may not be raised by a criminal defendant for the first time on appeal, unless it involves a "`manifest error affecting a constitutional right.'" State v. O'Donnell, 142 Wash.App. 314, 321-322, 174 P.3d 1205 (2007) (quoting RAP 2.5(a)(3)). Applicability of this exception is determined by applying the following two-part test:
First, the court determines whether the alleged error is truly constitutional. Second, the court determines whether the alleged error is "manifest," i.e., whether the error had "practical and identifiable consequences in the trial of the case."
State v. Kirkpatrick, 160 Wash.2d 873, 880, 161 P.3d 990 (2007) (citation omitted). Furthermore, "[o]nce the claim is found to be constitutional, the court examines the effect of the error on the defendant's trial under a harmless error standard." O'Donnell, 142 Wash.App. at 322, 174 P.3d 1205 (citing State v. Scott, 110 Wash.2d 682, 688, 757 P.2d 492 (1988)). In order for a constitutional error to be harmless, "it must appear beyond a reasonable doubt that the error did not contribute to the ultimate verdict." State v. Berube, 150 Wash.2d 498, 505, 79 P.3d 1144 (2003).
¶ 14 A person is guilty of felony harassmentthreats to kill, when:
(1). . . .
(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person . . . [and]
. . . .
(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out . . . [and]
(2). . . .
(b) . . . the person harasses another person under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person.
RCW 9A.46.020.
¶ 15 RCW 9A.46.020 "criminalizes pure speech." State v. Kilburn, 151 Wash.2d 36, 41, 84 P.3d 1215 (2004). Accordingly, this *1175 statute must comply with the requirements of the First Amendment. Id. There are a number of categories of speech that are without the protection of the First Amendment. See id. at 42-43, 84 P.3d 1215 (citing Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 504, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). One of these categories is "true threats." Id. at 43, 84 P.3d 1215. Therefore, "[t]o avoid unconstitutional infringement of protected speech, RCW 9A.46.020(1)(a)(i) must be read as clearly prohibiting only `true threats.'" Id. (citing Williams, 144 Wash.2d at 208, 26 P.3d 890; State v. J.M., 144 Wash.2d 472, 478, 28 P.3d 720 (2001)). Accordingly, "[a] conviction for felony harassment based upon a threat to kill requires that the State satisfy both the First Amendment demands  by proving a true threat was made  and the statute, by proving all the statutory elements of the crime." Id. at 54, 84 P.3d 1215. "True threat" is defined as "`a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life'" of another. Id. at 43, 84 P.3d 1215 (internal quotation marks omitted) (quoting Williams, 144 Wash.2d at 208-209, 26 P.3d 890). In addition, "whether a true threat has been made is determined under an objective standard that focuses on the speaker." Id. at 44, 84 P.3d 1215.
¶ 16 There is no published authority concerning whether the jury must be instructed on the definition of "true threat" in a harassment prosecution under RCW 9A.46.020. The issue has been addressed, however, under two other criminal statutes. See State v. Johnston, 156 Wash.2d 355, 127 P.3d 707 (2006) (addressing the issue under RCW 9.61.160, threats to bomb or injure property); State v. Tellez, 141 Wash.App. 479, 170 P.3d 75 (2007) (addressing the issue under RCW 9.61.230(2)(b), felony telephone harassment).
¶ 17 In Johnston, the defendant was arrested at Sea-Tac International Airport on two outstanding misdemeanor warrants. Johnston, 156 Wash.2d at 357-358, 127 P.3d 707. The arresting officer came into contact with the defendant after Alaska Airlines pilots notified the police the defendant, a passenger on their flight, appeared to be intoxicated. Id. During the booking process, the defendant told the arresting officer "he would come back to the airport and . . . this place up" and that "he was going to blow this place up." Id. at 358, 127 P.3d 707. The arresting officer testified the defendant stated "he knew about the airport, and he knew what it would take . . . all he needed was a Ryder truck and some nitro diesel fuel." Id. The arresting officer further testified the defendant "was `visibly upset' about the arrest." Id.
¶ 18 The defendant was charged with violating RCW 9.61.160, threats to bomb or injure property. Id. At trial, the defendant proposed a jury instruction defining "true threat," but the court declined to give the instruction, and instead instructed the jury "[t]hreat means to communicate, directly or indirectly, the intent to wrongfully cause physical damage to the property of a person other than the actor." Id. During its deliberations, the jury inquired, "Are we suppose[d] to judge if defendant is guilty of only `saying the words' or deciding if the defendant `actually has intent to carry out the threat?'" Id. at 359, 127 P.3d 707. In response, over objection from the defense, the trial court answered "Intent to carry out the threat is not an element of the crime." Id. The jury returned a verdict of guilty. Id.
¶ 19 On appeal, our Supreme Court first considered the constitutionality of RCW 9.61.160. Id. at 359-364, 127 P.3d 707. Finding "[t]he statute regulates pure speech," the court "construe[d it] to avoid an overbreadth problem by limiting it to true threats." Id. at 360, 364, 127 P.3d 707. Second, the court considered whether the jury was instructed properly. Id. The court stated "RCW 9.61.160 must be limited to true threats . . . and the jury must be instructed accordingly." Id. Therefore, the court held "the jury instructions given at trial were insufficient to ensure a constitutional verdict." Id. at 366, 127 P.3d 707. The court further held this instructional error was not *1176 harmless beyond a reasonable doubt.[2]Id. at 364, 127 P.3d 707. The court reasoned "[t]he evidence presented at trial appears close on the question whether [the defendant's] statements constituted a true threat." Id. In addition, the court reasoned that because the trial court informed the jury "intent to carry out the threat was not an element of the crime, the jury could infer the alternative was correct, i.e., that it could convict merely on the basis that [the defendant] said the words." Id. at 365, 127 P.3d 707 (footnote omitted). The court remanded the case for a new trial under proper instructions. Id. at 366, 127 P.3d 707.
¶ 20 In Tellez, the defendant was charged, in relevant part, with felony telephone harassment. Tellez, 141 Wash.App. at 481, 170 P.3d 75. At trial, the jury was given an instruction stating: "[a] true threat is a statement made in a context or under such circumstances where a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to carry out the threat." Id. at 482, 170 P.3d 75. However, the requirement that the threat be a "true threat" was not included in the information nor the "to convict" jury instruction. Id. at 481-482, 170 P.3d 75. The jury found the defendant guilty. Id. at 482, 170 P.3d 75.
¶ 21 On appeal to Division One of this court, the defendant argued, for the first time on appeal, the "true threat" language should have been included in the information and the "to convict" instruction. Id. at 482, 170 P.3d 75. The defendant relied on State v. Johnston, discussed above, arguing "Johnston holds that a true threat is an essential element that must be proven to the jury in any case involving a statute criminalizing the use of threatening language." Id. at 483, 170 P.3d 75. The court identified threats as pure speech, and therefore, statutes criminalizing threats "`must be interpreted with the commands of the First Amendment clearly in mind.'" Id. at 482, 170 P.3d 75 (internal quotations omitted) (quoting Williams, 144 Wash.2d at 207, 26 P.3d 890). The court then rejected the defendant's argument, stating "[t]he Johnston court merely held that the trial court erred by refusing to give a limiting instruction explaining that the bomb threat statute criminalizes only true threats." Id. at 483, 170 P.3d 75. The court further explained, "[t]he Johnston court did not rule that a true threat is an essential element of the crime of threatening to bomb a building." Id. Declining to extend Johnston, the court stated "[s]o long as the court defines a true threat for the jury, the defendant's First Amendment rights will be protected." Id. at 484, 170 P.3d 75. The court held "the essential element in the crime of telephone harassment is a threat which must be defined for the jury as a true threat." Id. Further, "[b]ecause the true threat concept itself is not an essential element . . . it need not be included in the charging document or [the] `to convict' instruction." Id. Accordingly, the court affirmed the defendant's conviction. Id.
¶ 22 Here, like in State v. Johnston, the statute at issue criminalizes "pure speech," and accordingly, has been limited to prohibit only "true threats." See Kilburn, 151 Wash.2d at 41, 43, 84 P.3d 1215 (stating RCW 9A.46.020 "criminalizes pure speech," and limiting the statute to "true threats"). Therefore, like in State v. Johnston, the jury instructions given at trial, by not providing a definition of "true threat," were deficient. Furthermore, although State v. Tellez held "true threat" was not an essential element of the crime of felony telephone harassment, another crime targeting "pure speech," the court affirmed that a "true threat" must be defined for the jury in order to protect a defendant's First Amendment rights. See Tellez, 141 Wash.App. at 483-484, 170 P.3d 75. We conclude that a jury in a criminal harassment prosecution likewise must be instructed on the concept of "true threat." Therefore, the definition of "threat" in jury instruction 10 was not sufficient to protect Mr. Schaler's First Amendment rights. The court erred in failing to instruct the jury on the definition of "true threat."
*1177 ¶ 23 Concluding the trial court erred in failing to instruct the jury on the definition of a "true threat," this court must now decide whether this error was harmless beyond a reasonable doubt. See Johnston, 156 Wash.2d at 364-365, 127 P.3d 707. Unlike in State v. Johnston, the evidence at trial here was not close on the issue of whether Mr. Schaler's statements were "true threats." Id. at 364, 127 P.3d 707. Ms. Heller-Wilson testified Mr. Schaler told her he wanted to kill Ms. Nockels, Ms. Busbin, and Mr. Busbin, "with his bare hands, by strangulation," and that he had been thinking about it for months. Mr. Schaler specifically told Ms. Heller-Wilson he wanted to harm his neighbors, repeated his statements several times over a four-hour period, and did not indicate his statements were not serious. Additionally, the jury heard about the June 1, 2005 incident involving Mr. Schaler cutting the fruit trees between Ms. Nockels' and Ms. Busbin's properties, that Ms. Nockels and Ms. Busbin had obtained protection orders against Mr. Schaler, and that law enforcement had responded to a harassment complaint on July 23, 2005. Based on this testimony, the jury would have concluded, as it did, that "true threats" were made, that "`a reasonable person would foresee that the statement[s] would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life'" of another. Kilburn, 151 Wash.2d at 43, 84 P.3d 1215 (internal quotation marks omitted) (quoting Williams, 144 Wash.2d at 208-209, 26 P.3d 890). It appears, beyond a reasonable doubt, that the failure to instruct the jury on the definition of "true threat" did not contribute to the ultimate verdict. Accordingly, this error was harmless.
¶ 24 Not only was the evidence overwhelming on this point, the "true" nature of the threats simply was not at issue at trial. The defense theory of the case was that the threats were not "knowingly" made (i.e., with the intent that they be conveyed to the victims). There simply was no contention that the threats were not serious or "true."
¶ 25 For both reasons, we conclude that the error in failing to give a "true threat" instruction was harmless beyond a reasonable doubt. Accordingly, the constitutional error identified in this appeal was not "manifest" per RAP 2.5(a)(3).
¶ 26 The remaining issue here is whether the evidence was sufficient to support the verdict. In particular, Mr. Schaler argues that the evidence did not establish that his statements were "true threats."[3]
¶ 27 Because Mr. Schaler's sufficiency of the evidence argument concerns whether he made "true threats," and therefore, whether his speech was unprotected, implicating the First Amendment, "[i]t is not enough to engage in the usual process of assessing whether there is sufficient evidence in the record to support the trial court's findings." Kilburn, 151 Wash.2d at 49, 84 P.3d 1215. Instead, the applicable standard of review is "the rule of independent review," under which this court "must independently review the crucial facts in the record, i.e., those which bear on the constitutional question." Id. at 52, 84 P.3d 1215. This is "not complete de novo review." Id. at 51, 84 P.3d 1215. The standard requires "a full review of only those facts in a record that relate to the First Amendment question whether certain expression was unprotected." Id. at 50, 84 P.3d 1215. Credibility findings must be given deference. Id.
¶ 28 In State v. Johnston, the defendant also argued the evidence was insufficient to establish he made a "true threat." Johnston, *1178 156 Wash.2d at 365, 127 P.3d 707. Considering this argument, the court stated "[w]hether language constitutes a true threat is an issue of fact for the trier of fact in the first instance." Id. (citing United States v. Fulmer, 108 F.3d 1486, 1492 (1st Cir.1997); United States v. Khorrami, 895 F.2d 1186, 1192 (7th Cir.), cert. denied, 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990); Melugin v. Hames, 38 F.3d 1478, 1485 (9th Cir.1994)). The court identified "a rule of independent appellate review applies in First Amendment speech cases." Id. The court then found independent appellate review was inappropriate under the circumstances, declining to consider the issue. Id. at 366, 127 P.3d 707. The court reasoned, "[i]f . . . the trial proceedings are tainted by error, an appellate court may be unable to conduct an independent review of the record  for example, where inadmissible evidence that was admitted may have influenced the jury." Id. (citing United States v. Hanna, 293 F.3d 1080, 1088 (9th Cir.2002)). Applying this rule to the case before it, the court found "[i]n [the defendant's] case, the jury was influenced by the erroneous jury instructions that governed the trial." Id.
¶ 29 The current case is distinguishable from State v. Kilburn, where the court concluded the evidence was insufficient to establish a "true threat." See Kilburn, 151 Wash.2d at 52-53, 84 P.3d 1215. In Kilburn, the defendant stated to a classmate, K.J., "I'm going to bring a gun to school tomorrow and shoot everyone and start with you . . . maybe not you first." Id. at 39, 84 P.3d 1215. The defendant was charged with one count of felony harassment, under RCW 9A.46.020, based on this statement. Id. at 39-40, 84 P.3d 1215. The court reiterated K.J.'s testimony:
K.J. testified that at the end of the last class the students were chatting, giggling, and laughing as they often did at the end of the school day. [The defendant] and K.J. started talking about books they were reading; [the defendant] had a book that had military men and guns on it. [The defendant] then turned to K.J. and, half smiling, said he was going to bring a gun the next day and shoot everyone, beginning with her. Then he began giggling, and said maybe not her first. K.J. testified that [the defendant] started to "laugh or giggle" as if he were not serious, and that "he was acting kind of like he was joking." K.J. testified that she said "okay," and that she said "right" in an exaggerated tone.
Id. at 52, 84 P.3d 1215.
¶ 30 K.J. further testified she and the defendant knew each other for two years, never fought or had a disagreement, and the defendant "always treated her nicely." Id. Additionally, she testified the defendant joked in the past, both she and other classmates laughed at these jokes, and the defendant also joked with a friend who sat behind him. Id. at 52-53, 84 P.3d 1215. The court concluded:
[T]he evidence is insufficient for a reasonable person in [the defendant's] place to foresee that K.J. would interpret his statement as a serious threat to cause bodily injury or death, given his past relationship with K.J., his having joked with her and his other friend in the class before, the discussion that had been taking place about the books they were reading, and his laughing or giggling when he made his comments.
Id. at 53, 84 P.3d 1215.
¶ 31 Here, in contrast, the relationship between Mr. Schaler and his victims prior to the threats at issue was tumultuous. First, there was the June 1, 2005 incident involving the fruit trees between Ms. Nockels' and Ms. Busbin's properties. Second, both Ms. Nockels and Ms. Busbin obtained protection orders again Mr. Schaler. Third, law enforcement had responded to a harassment complaint on July 23, 2005, involving the parties. Given all, the evidence was sufficient to establish "true threats." A reasonable person in Mr. Schaler's position would interpret his statements as a serious threat to cause bodily injury or death. The evidence supported the jury's verdicts.
¶ 32 Accordingly, the convictions are affirmed.
I CONCUR: BROWN, J.
*1179 SWEENEY, J. (dissenting).
¶ 33 The central issue in this case is not whether Glen Schaler said what he said, but whether his statements were intended as true threats. Here is what his lawyer argued: "This was not a criminal act on the part of Mr. Schaler, because he never intended that his action was the communication of a threat. His action was a cry, cry for help. And that's exactly what he was doing." Report of Proceedings (Feb. 7, 2007) at 110. The Supreme Court concluded in State v. Johnston (on what I believe are less compelling facts than the facts here) that the failure to instruct on true threats was not harmless and remanded for a new trial. State v. Johnston, 156 Wash.2d 355, 366, 127 P.3d 707 (2006). Of course, the court erred by failing to instruct on "true threat." And this error was not harmless by any principled standards. To conclude otherwise is effectively to conclude that Mr. Schaler is guilty as a matter of law. We should not do that.
¶ 34 I would conclude that the threats here were true threats were I the fact finder in this case. I am persuaded. But I am not the finder of fact. I am instead a concluder of law. And, so, for me to find true threats (beyond a reasonable doubt, no less) usurps the role properly reserved to a jury. And it deprives Mr. Schaler of his constitutional right to have a jury make those findings. Johnston, 156 Wash.2d at 365, 127 P.3d 707. We should not do that. The error would be harmless if Mr. Schaler denied making these threats. He, however, admits he made the statements. His defense is that he did not mean them, i.e., they were not true threats. But the jury here, like the jury in Johnston, was not able to evaluate whether they were or not because there was no definitional instruction that told it how to do so.
¶ 35 Courts of appeals, as institutions, are capable of evaluating whether evidence is sufficient (burden of production). Welch Foods, Inc. v. Benton County, 136 Wash.App. 314, 322, 148 P.3d 1092 (2006). We are not, however, well situated to decide how persuasive that evidence was to this particular jury or to any jury. See id. (fact finders determine whether the burden of persuasion has been met). Again, we should not try to. Judges are sometimes surprised by the results juries reach. I do not know what this jury might have done if properly instructed. It may well have concluded that Mr. Schaler's statements were not true threats and that, accordingly, they were protected speech. See Johnston, 156 Wash.2d at 362, 127 P.3d 707 (true threats are unprotected speech). I, therefore, respectfully dissent.
NOTES
[1] A pick up order is a document sent from Okanogan Behavioral Health Care to law enforcement, requesting law enforcement transport the individual named in the order either to the hospital or to the Okanogan Behavioral Health Facility for an evaluation. Deputy Humphrey testified a pick up order is a civil, rather than a criminal, process and that it relates to someone who is a threat to themselves or others.
[2] The State conceded the error could not be deemed harmless beyond a reasonable doubt. Johnston, 156 Wash.2d at 364, 127 P.3d 707. Furthermore, the parties agreed the failure to instruct on the definition of "true threat" was error. Id.
[3] Mr. Schaler also challenges a finding of fact entered following his pretrial motion to dismiss pursuant to State v. Knapstad. However, "after proceeding to trial, a defendant cannot appeal the denial of a Knapstad motion, which is a pretrial challenge to the sufficiency of the evidence." State v. Cannon, 120 Wash.App. 86, 90, 84 P.3d 283 (2004) (citing State v. Richards, 109 Wash.App. 648, 653, 36 P.3d 1119 (2001)). To the contrary, when a case proceeds to trial, the proper argument on appeal is insufficiency of the evidence, based on the evidence adduced at trial. Id. (citing Richards, 109 Wash.App. at 653, 36 P.3d 1119).

Although Mr. Schaler also appears to argue the court improperly denied his pretrial and midtrial motions to dismiss, the standard of review is the same. See, e.g., State v. Athan, 160 Wash.2d 354, 378 n. 5, 158 P.3d 27 (2007) (stating that insufficiency of the evidence, denial of a pretrial Knapstad motion, and denial of a midtrial motion to dismiss are reviewed under the same standard).