236 P.3d 858 (2010)
STATE of Washington, Respondent,
v.
Glen Arthur SCHALER, Petitioner.
No. 81864-9.
Supreme Court of Washington, En Banc.
Argued November 16, 2009.
Decided July 29, 2010.
*860 Tanesha La Trelle Canzater, Attorney at Law, Bellingham, WA, for Petitioner.
Karl F. Sloan, Felecia Shay Chandler, Okanogan County Prosecutor's Office, Okanogan, WA, for Respondent.
STEPHENS, J.
¶ 1 This case concerns the interplay between the threats-to-kill provision of Washington's harassment statute, RCW 9A.46.020, and the First Amendment's limits on the criminalization of speech. We adhere to our previous position that the harassment statute must be read to proscribe only "true threats" and hold that the jury instructions in this case did not adequately limit the statute's reach. Given the evidence at trial, the instructional error was not harmless. We therefore reverse and remand for a new trial under proper instructions.

BACKGROUND FACTS AND PROCEDURAL HISTORY
¶ 2 On the morning of August 10, 2005, Director Tonya Heller-Wilson of Crisis Services for Okanogan Behavioral Healthcare received a call from Glen Schaler, who claimed to have killed his neighbors.[1] Schaler was crying and hysterical. He told Heller-Wilson that he awoke from a dream and thought he had killed his neighbor, and that killing his neighbors had been occupying his daytime thoughts, too. Heller-Wilson testified that Schaler seemed extremely upset at the prospect that he might have hurt someone. He threatened to kill himself. Heller-Wilson had a co-worker contact the police.
¶ 3 Deputy Connie Humphrey arrived at Schaler's residence several minutes later, while Schaler was still on the phone with Heller-Wilson. When Humphrey knocked on Schaler's door, Schaler told her to "go away" and said, "`I dreamed I slit her throat.'" Verbatim Report of Proceedings (VRP) (Feb. 6, 2007) at 207. Schaler handed Humphrey the phone through the doorway, and Heller-Wilson asked Humphrey to bring Schaler in for an evaluation if the situation did not turn into a criminal investigation. When Humphrey entered, she observed that *861 Schaler was "sweating and panting," as though he "was having difficulty getting a complete breath." Id. at 212. Schaler indicated he had not taken his medication that morning. Humphrey found no evidence that any neighbors had been injured and convinced Schaler to accompany her to Mid Valley Hospital for an evaluation. At Humphrey's urging, Schaler took his medication before leaving for the hospital.
¶ 4 Deputy Humphrey brought Schaler to the hospital and left him in Heller-Wilson's care. Humphrey was called back to the hospital twice during the next several hours to assist Heller-Wilson. Humphrey tried to get Schaler to comply with the mental health staff, who at one point attempted to give Schaler an injection. In response, Schaler stated, "`[B]ring it on, cause there was going to be a fight, and that someone was going to get hurt[,]' [h]e could guarantee it," but then told the staff how he had previously suffered back and neck injuries. Id. at 220. Schaler also said that "next time he was going to get a bunch of guns, and it would be [a] blood bath." Id. Based on his behavior, Schaler's commitment status was changed from voluntary to involuntary because Heller-Wilson believed Schaler was a danger to himself and to others.
¶ 5 Heller-Wilson came "in and out of the room" while Schaler was receiving medical attention at the hospital, including the drawing of his blood. Id. at 250. She testified that Schaler was having some sort of mental breakdown. During Heller-Wilson's contact with Schaler, he repeatedly referred to two neighbors, Kathy Nockels and Denise Busbin. Schaler "was pretty specific that he, he wanted to kill his neighbors." Id. at 247. Schaler specifically said that "he wanted to kill them with his bare hands, by strangulation," although he also said, "`I hope I didn't really kill her.'" Id. at 248, 267. Schaler said that he had been planning his neighbor's death for months and had dreamt about it, but in the dream she hit him and scratched his face. Heller-Wilson tried to ascertain whether Schaler was making a serious threat:
I can't recall specifically how I asked him. I, I know that you don't, it's part of my job to try to keep people out of the hospital. And when people tell me that they feel like they want somebody to die, or they want to die, I always go into the explanation that you know, there are times that I wish I were dead, but I don't have a plan to kill myself. I mean, you know, there are just times, and there's times that I wish my, my boss didn't exist, but I don't have a plan to kill him. And I kind of went that way, and I said "You know, sure, you might wish that they weren't there. Maybe you're [sic] life would be a little bit easier." But he said specifically, he wanted to harm them.
Id. at 248-49. Schaler repeated his desire to kill his neighbors to Heller-Wilson over the approximately four hours she spent with him. He appeared angry when he made these comments and never said he was not serious or did not mean what he said. Heller-Wilson believed Schaler had made a "viable threat" and so, pursuant to her duty to warn,[2] she contacted Nockels and Busbin to inform them of Schaler's comments. Id. at 251-53. On cross-examination, Heller-Wilson acknowledged that the situation was complicated by the fact that Schaler initiated contact with her office, was clearly agitated, and was requesting help from her as a crisis counselor.
¶ 6 Schaler told Heller-Wilson of an incident on June 1, 2005, involving a dispute over fruit trees, which he said was one reason that he wanted to kill his neighbors. Schaler believed that a row of Busbin's fruit trees was interfering with his rightful access to an alley. Nockels called the police after she noticed Schaler cutting the trees with a chain saw. When Nockels asked Schaler to stop, Schaler raised his chain saw toward Nockels and told her to "stay out of this." VRP (Feb. 7, 2007) at 10-11. Deputy Michael Blake arrived in response to the 911 call. After Blake arrived, Schaler said that "`it was *862 obvious that somebody [was] going to die.'" VRP (Feb. 6, 2007) at 288. Schaler repeated this statement, and Blake asked what Schaler meant and why it was obvious. Schaler did not answer. Blake informed Schaler that Blake took Schaler's statement very seriously, and after a long pause, Schaler stated that he thought he (Schaler) would be the one to die, citing an incident where he claimed Busbin's husband had threatened him with a shotgun. Blake asked Schaler if he thought he was going to kill someone, and Schaler replied that "when he [Schaler] became angry, he did feel like that he wanted to kill someone, and that that was a natural human response." Id. at 291. He did not say anything more specific.
¶ 7 Nockels testified that she believed Schaler was going to kill her as a result of the fruit tree incident. She felt similarly after Heller-Wilson warned her of Schaler's comments at the hospital. Busbin felt Schaler was capable of carrying out the threats. Both women obtained protective orders against Schaler after the tree incident and thereafter made sure that each woman always knew the location of the other.
¶ 8 Schaler was charged with two counts under the threats-to-kill provision of the harassment statute, RCW 9A.46.020(1)(a)(i), (1)(b), (2)(b)(ii), for his statements to Heller-Wilson regarding Nockels and Busbin. Schaler successfully requested a jury instruction requiring the jury to find that he subjectively intended to communicate a threat. No party requested an instruction as to the definition of "true threat," nor did Schaler object to the State's proposed definition of "threat," which was not limited to true threats. The term "true threat" did not appear in any of the jury instructions. Schaler was sentenced to two 10-month terms of confinement to be served concurrently.
¶ 9 On appeal, Schaler argued that the evidence was insufficient to support the jury's verdict. He also challenged the jury instructions for the first time, arguing that the First Amendment requires an explicit "true threat" instruction. The Court of Appeals held that the trial court erred by failing to instruct the jury on "true threats" but that any error was harmless beyond a reasonable doubt. State v. Schaler, 145 Wash.App. 628, 640-41, 186 P.3d 1170 (2008). It further held that the evidence at trial was sufficient to support Schaler's conviction. Id. at 644, 186 P.3d 1170. We granted review. 165 Wash.2d 1015, 199 P.3d 411 (2009).

STANDARD OF REVIEW
¶ 10 Instructional errors based on legal rulings are reviewed de novo, as are constitutional questions. State v. Grande, 164 Wash.2d 135, 140, 187 P.3d 248 (2008); State v. Brett, 126 Wash.2d 136, 171, 892 P.2d 29 (1995). We engage in independent review of the record in First Amendment cases "`so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.'" State v. Kilburn, 151 Wash.2d 36, 49-50, 84 P.3d 1215 (2004) (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 508, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)).
¶ 11 Here, Schaler failed to raise his First Amendment argument until appeal. An appellate court may refuse to address a claim of error not raised in the trial court unless it finds a "manifest error affecting a constitutional right." RAP 2.5(a)(3). An error is "manifest" if it had practical and identifiable consequences in the case. State v. O'Hara, 167 Wash.2d 91, 99, 217 P.3d 756 (2009). Even manifest constitutional errors may be harmless. Id. at 98, 217 P.3d 756.

ANALYSIS

I. Jury Instructions

1. True Threats

¶ 12 "The First Amendment, applicable to the States through the Fourteenth Amendment, provides that `Congress shall make no law ... abridging the freedom of speech.'" Virginia v. Black, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). While the scope of the First Amendment is broad, it does not extend to "unprotected speech." Kilburn, 151 Wash.2d at 42-43, 84 P.3d 1215.
¶ 13 "True threats" occupy one category of unprotected speech. Id. at 43, 84 P.3d 1215. A true threat is "a statement *863 made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to inflict bodily harm upon or to take the life of another person." Id. (internal punctuation and quotation marks omitted) (quoting State v. Williams, 144 Wash.2d 197, 208-09, 26 P.3d 890 (2001)). The State has a significant interest in restricting speech that communicates a true threat, including "`protect[ing] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur.'" Id. (quoting State v. J.M., 144 Wash.2d 472, 478, 28 P.3d 720 (2001)). The speaker of a "true threat" need not actually intend to carry it out. Id. at 46, 84 P.3d 1215. It is enough that a reasonable speaker would foresee that the threat would be considered serious.
¶ 14 Importantly, only threats that are "true" may be proscribed. The First Amendment prohibits the State from criminalizing communications that bear the wording of threats but which are in fact merely jokes, idle talk, or hyperbole. Id. at 43, 84 P.3d 1215. We recently interpreted the bomb threat statute, RCW 9.61.160, to reach only "true threats" in order to save it from a constitutional challenge. State v. Johnston, 156 Wash.2d 355, 364, 127 P.3d 707 (2006). We adhere to this principle and construe the threats-to-kill provision of RCW 9A.46.020 to the same effect.

2. Instructional Error

¶ 15 Schaler assigns error to the trial court's failure to give the jury a true threat instruction. Because he did not object to the instructions at trial, the first question we must address is whether this case involves a manifest error affecting a constitutional right. See RAP 2.5(a). An error is manifest if it had practical and identifiable consequences in the case. O'Hara, 167 Wash.2d at 99, 217 P.3d 756. This standard is also referred to as "actual prejudice." Id. As we explained in O'Hara,
[T]he focus of the actual prejudice [analysis] must be on whether the error is so obvious on the record that the error warrants appellate review.... Thus, to determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error.
Id. at 99-100, 217 P.3d 756 (citation and footnote omitted). This analysis is distinct from deciding whether the error was harmless and therefore does not warrant reversal. Id. at 98, 217 P.3d 756.
¶ 16 Schaler argues that he did not make a true threat, as constitutionally required, because he was describing his mental state and the contents of a dream he was having to a mental health specialist after calling a crisis services hotline. Pet. for Review at 13, 16. In the context of his mental health evaluation, Schaler contends, his words were a cry for help, and a reasonable person in his position would not foresee that a listener would take them as a serious expression of intent to kill his neighbors. Appellant's Opening Br. at 11-12.
¶ 17 The State responds that no true threat instruction was necessary because the threats-to-kill provision was sufficiently narrowed by the instructions at trial. Br. of Resp't at 30-31; Suppl. Br. of Resp't at 3-5.
¶ 18 In pertinent part, the threats-to-kill provision reads:
(1) A person is guilty of harassment if:
(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; [and]
. . . .
(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out....
. . . .
[(2)](b) A person who harasses another is guilty of a class C felony if ... the person harasses another person under subsection *864 (1)(a)(i) of this section by threatening to kill the person threatened....
RCW 9A.46.020(1)-(2).
¶ 19 The trial court instructed the jury as to the statutory elements in instructions 5 and 16. Clerk's Papers (CP) at 26, 33, 44. The court further instructed the jury in instruction 10 that "`threat' means to communicate, directly or indirectly, the intent to cause bodily injury immediately or in the future to the person threatened or to any other person." CP 26, 38 (paralleling RCW 9A.04.110(27)(a)). At Schaler's urging, the court added jury instruction 12, which read, "A person threatens `knowingly' when the person subjectively intends to communicate a threat." CP at 26, 40, 55-46.
¶ 20 Reading the definitions into the statute, the jury was advised that a person is guilty of threats-to-kill harassment if (1) without lawful authority, he subjectively intends to communicate, directly or indirectly, the intent to kill the person threatened or any other person, and (2) by words or conduct, he places the person threatened in reasonable fear that the threat will be carried out. We can therefore construct the following schematic of what the jury was told is criminalized by the threats-to-kill provision:

Conduct: Communicating, i.e., uttering words or undertaking expressive conduct to another.

Circumstances: The words or conduct suggest an intent to kill somebody.

Result: The person threatened reasonably fears that the threat will be carried out.

Mens Rea: As to the conduct and circumstances, the person acts intentionally.
¶ 21 No mens rea was specified as to the result. The jury instructions did not state that the defendant must know or foresee that the person threatened (or, for that matter, any listener) would reasonably fear that the threat will be carried out. This is because the statute uses the term "knowingly threaten" in subsection (1)(a) but includes no mens rea term in the separate subsection listing the result requirement, (1)(b). RCW 9A.46.020(1). If "knowingly threaten" had been left to its ordinary meaning, it could be understood to require that the speaker be aware that his words or actions frightened the hearerafter all, how can one knowingly threaten without knowing that what one says is threatening to another? However, the term "knowingly threaten" was expressly defined in instruction 12 as "intend[ing] to communicate a threat." And the definition of "threat" in RCW 9A.04.110(27)(a), contained in instruction 10 in this case, said nothing about the fear that typically results from a threat. It defined threat merely in terms of communicating (conduct) and what the communication means (circumstances), i.e., it required the jury to find only that the words spoken suggested an intent to kill. Under these instructions, the statutory requirement of knowing or even intentional threatening refers only to the conduct and circumstances proscribed, but not the proscribed result.
¶ 22 In some criminal contexts, the lack of mens rea as to a proscribed result poses no problem. For example, one can commit first degree murder if, in the course of committing first degree burglary, one causes the death of a nonparticipant; no mens rea as to the result of death is required. RCW 9A.32.030(1)(c).
¶ 23 In the context of criminalizing speech, however, the lack of mens rea as to the result is critical. Because the First Amendment limits the statute to proscribing "true threats," it must be read to reach only those instances "`wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention... to take the life of another person.'" Kilburn, 151 Wash.2d at 43, 84 P.3d 1215 (emphasis added) (internal punctuation and quotation marks omitted) (quoting Williams, 144 Wash.2d at 208-09, 26 P.3d 890). This standard requires the defendant to have some mens rea as to the result of the hearer's fear: simple negligence.[3]See W. PAGE KEETON ET AL., PROSSER & KEETON ON TORTS § 31, at 169 (5th ed. 1984) (describing negligence as the failure to guard against "a risk *865 of [certain] consequences, sufficiently great to lead a reasonable person ... to anticipate them"). Because the First Amendment requires negligence as to the result but the instructions here required no mens rea as to result, the jury could have convicted Schaler based on something less than a "true threat." The instructions were therefore in error.[4]
¶ 24 This error was manifest and affected a constitutional right. Because they did not comply with the First Amendment's "true threat" requirement, the instructions given at trial allowed the jury to convict Schaler based on his utterance of protected speech.[5]See Johnston, 156 Wash.2d at 364-65, 127 P.3d 707 (holding that the failure to instruct on "true threat" was not harmless because the evidence was close on whether the defendant had the appropriate mens rea). The trial court could have corrected the error given the clear state of the law at the time that it instructed the jury. We therefore hold that the error was manifest and thus properly addressed on appeal.

3. Harmless Error

¶ 25 We must further determine whether the omission of the constitutionally required mens rea from the jury instructions is subject to harmless error analysis. The situation is analogous to one in which the jury instructions omit an element of the crime.[6] An omission of an essential element from the jury instructions may be harmless when it is clear that the omission did not contribute to the verdict. State v. Brown, 147 Wash.2d 330, 340-41, 58 P.3d 889 (2002). This is clear, for example, when the omitted element is supported by uncontroverted evidence. Id. at 341, 58 P.3d 889. On the other hand, error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds. See id. at 341-43, 58 P.3d 889 (holding that erroneous accomplice liability instructions were not harmless for any charges against the defendants wherein the jury might have convicted on an improper understanding of the law); see also Johnston, 156 Wash.2d at 364-65, 127 P.3d 707 (stating that the error was not harmless because the jury could have convicted "merely on the basis that Johnston said the words" of a threat).
¶ 26 Here, we cannot know whether the jury properly determined that Schaler's threats to kill his neighbors were "true threats." Certainly, there was evidence that Schaler said he wanted to kill his neighbors, described planning to do so, and dreamt about the event. However, Schaler never explicitly said that he would do so, his behavior at the time was erratic, and he was often contradictory. For example, he said that he wished to kill his neighbor with his bare hands, but in the same breath said that he *866 hoped he did not kill her. Also, when he threatened to fight with the mental health workers who wanted to give him an injection, Schaler said that someone would get hurt but then suggested that, from prior injuries, he himself would be the one hurt.
¶ 27 Such utterances do not unequivocally lead to a finding of a true threat. They are also consistent with an impression of Schaler as mentally unstable and lashing out somewhat incoherently at those around him. Cf. Johnston, 156 Wash.2d at 357-58, 364-65, 127 P.3d 707 (suggesting that a drunken defendant's outbursts might not have been true threats). Furthermore, Schaler's statements took place in the context of a mental health evaluation, which occurred in the hospital while Schaler received medical treatment. The statements were uttered to a crisis counselor, Heller-Wilson, who testified that Schaler was in the midst of a mental breakdown. Schaler appeared to be very upset at the idea that he might have hurt someone. Indeed, he had called the crisis hotline for help and stated that he was considering suicide.
¶ 28 Thus, while the jury could have concluded that Schaler's statements were serious threats and that a reasonable speaker would so regard them, they could also have concluded that Schaler's threats were a cry for help from a mentally troubled man, directed toward mental health professionals who could help him.[7] For this reason we cannot conclude on the record that there was "uncontroverted evidence" that Schaler's threats were true threats. Therefore, the omission of a true threat instruction was not harmless. Reversal is required because the jury was not asked to decide whether a reasonable person in Schaler's position would foresee that his statements or acts would be interpreted as a serious expression of intent to carry out the threat, and the evidence was ambiguous on the point.[8]

II. Sufficiency of the Evidence
¶ 29 The final question we must answer is whether the case should be remanded for a new trial under proper instructions or instead dismissed. Schaler argues that we should dismiss due to a lack of sufficient evidence to sustain a conviction. See Burks v. United States, 437 U.S. 1, 11 & n. 6, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ("The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding."). We do not agree that dismissal is required.
¶ 30 There was ample evidence from which a reasonable jury could determine that Schaler's threats were "true threats." As discussed above, the evidence at trial was open to interpretation as to whether Schaler's threats were "true threats" or a cry for helpbut both conclusions were possible. *867 Schaler admitted to Heller-Wilson that he had been planning to kill his neighbors for months and that he wanted to do so. His demeanor did not suggest to Heller-Wilson that his words were idle talk or a joke. Heller-Wilson questioned Schaler to determine if he was serious and came to believe that he was. Moreover, the threats at issue built upon Schaler's history of unpleasant interactions with his neighbors, including the fruit tree dispute (in which he wielded a chain saw) that resulted in his neighbors obtaining restraining orders. From the evidence, the jury could have concluded that a reasonable speaker in Schaler's position would have foreseen that his threats would be interpreted as a serious expression of his intention to take the life of another individual. Double jeopardy therefore does not bar retrial.

III. Invited Error
¶ 31 Justice J.M. Johnson's dissent argues that Schaler knew about the true threats requirement because he brought a pretrial motion to dismiss based on lack of evidence of a true threat, yet did not request a true threats instruction. The dissent characterizes this as "actively participat[ing] in determining the jury instructions" and "assent[ing] to them." Dissent (J.M. Johnson, J.) at 873. It criticizes us for allowing Schaler to invite error and then, on appeal, obtain a reversal based on it.
¶ 32 Invited error was not raised by the parties at any point in this litigation. See State v. Studd, 137 Wash.2d 533, 547, 973 P.2d 1049 (1999) ("[W]e are not in the business of inventing unbriefed arguments for parties sua sponte."). Deciding this case on new grounds never considered by the parties is ill advised, at best. Moreover, the invited-error doctrine as applied to jury instructions precludes a defendant from arguing that an instruction he proposed was erroneous. See State v. Henderson, 114 Wash.2d 867, 867-71, 792 P.2d 514 (1990); see also Studd, 137 Wash.2d at 552, 973 P.2d 1049 (allowing the defendant to escape the doctrine if he also proposed an instruction correcting the error); City of Seattle v. Patu, 147 Wash.2d 717, 720, 58 P.3d 273 (2002) (interpreting Studd's holding to be that "those defendants who had proposed the erroneous instruction without attempting to add a remedial instruction had invited the error" (emphasis added)); State v. Aho, 137 Wash.2d 736, 744-45, 975 P.2d 512 (1999) ("Under the invited error doctrine, a defendant may not request that instructions be given to the jury and then complain upon appeal that the instructions are constitutionally infirm." (emphasis added)). The dissent admits that Schaler did not propose the erroneous definition of "threat," which was not limited to true threats, and did not propose the "to convict" instruction. This case should not be decided on the unbriefed invited-error doctrine.

CONCLUSION
¶ 33 The threats-to-kill provision of the harassment statute must be read in light of the First Amendment to proscribe only "true threats." The provision therefore requires proof that the defendant was (at least) negligent as to his threats' effect on listeners. Specifically, the State must establish that a reasonable person in the defendant's position would foresee that his statements or acts would be interpreted as a serious expression of intention to carry out the threat. The failure of the instructions at Schaler's trial to inform the jury of this requirement was a manifest constitutional error. Furthermore, the error was not harmless because the evidence at trial was open to interpretation. The jury could have concluded that Schaler's outbursts were a cry for help and that a reasonable person in Schaler's situation would not have foreseen them being interpreted as serious. Alternatively, the jury could have concluded that Schaler's utterances constituted a true threat. We therefore reverse Schaler's conviction and remand for a new trial.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, and MARY E. FAIRHURST, Justices.
SANDERS, J. (concurring in part and dissenting in part).
¶ 34 I concur with the majority that Glen Schaler's conviction should be reversed because *868 the jury instructions for the harassment statute were required to and did not include the mens rea element.
¶ 35 However, I dissent from the majority to the extent it remands this case for a new trial. A new trial is unnecessary because, as a matter of law, none of Schaler's statements here constitutes a "true threat." There is no remaining issue for the jury to consider on remand, and the RCW 9A.46.020 charge against Schaler should be dismissed.
¶ 36 The harassment chapter under Washington law was enacted to "mak[e] unlawful the repeated invasions of a person's privacy by acts and threats which show a pattern of harassment designed to coerce, intimidate, or humiliate the victim." RCW 9A.46.010. "Threat," undefined in the chapter, is defined elsewhere as "[a] communicated intent to inflict harm or loss on another or on another's property, esp[ecially] one that might diminish a person's freedom to act voluntarily or with lawful consent...." Black's Law Dictionary 1618 (9th ed. 2009); see also Webster's Third New International Dictionary 2382 (2002) ("threat" defined as "expression of an intention to inflict loss or harm on another by illegal means and esp[ecially] by mean involving coercion or duress of the person threatened ..."). Both by the underlying purpose of the harassment statute and the common definition, a threat is something more than merely expressing one wants to do something; it is expressing an intention to do it with a purpose to coerce, intimidate, or humiliate someone.
¶ 37 A "`true threat'" is "`a statement made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted... as a serious expression of intention to inflict bodily harm upon or to take the life of [another individual]."'" State v. Williams, 144 Wash.2d 197, 207-08, 26 P.3d 890 (2001) (emphasis added) (alterations in original) (quoting State v. Knowles, 91 Wash. App. 367, 373, 957 P.2d 797 (1998) (quoting United States v. Khorrami, 895 F.2d 1186, 1192 (7th Cir.1990))).
¶ 38 Let's view Schaler's statements under the accompanying circumstances. If Schaler seriously intended to kill his neighbors, would he (a) go next door to his neighbor's home and attempt it, (b) tell his friends, co-workers, or even his neighbors that he was going to kill his neighbors, or (c) call a crisis services hotline and seek help? Circumstance (a) demonstrates intent through action. Circumstance (b), depending upon the accompanying details, may constitute a true threata reasonable person might foresee the statements would be interpreted as a serious expression of intent to take another's life. However, circumstance (c) would not lead a reasonable person to foresee such intent because the speaker's behaviorseeking help from a crisis services hotlineis entirely inconsistent with actual intent to kill someone. Contacting the hotline implies the individual may have been tempted to cause someone harm. But it also shows the person sought help because he or she did not want or intend to succumb to that temptation and did not want or intend to actually cause harm.
¶ 39 Glen Schaler was a troubled manno question. During the day, thoughts of killing his neighbors invaded his mind. He woke up from a dream one morning andnot fully able to distinguish fantasy from reality thought he might have actually killed his neighbors. In fact, he was extremely upset by the thought and, despite his hysterical state of mind, called the crisis services hotline.
¶ 40 He then agreed to accompany a police officer to Mid Valley Hospital. Once there, he was involuntarily committed due to his troubled state of mindwhich Director Tonya Heller-Wilson, one of the staff members taking part in Schaler's treatment, characterized as "`[v]ery hysterical'" when he originally called, Trial Tr. vol. II, 269, Feb. 6, 2007and due to his antagonistic behavior toward staff.
¶ 41 After being involuntarily committed a restraint that probably did not serve to calm an extremely upset individualhe spoke openly, and very heatedly, to medical professionals, saying he wanted to kill his neighbors. Id. at 248. He said he wanted to strangle them with his bare hands. Id. He also stated, in light of the vivid dream he *869 had, that he hoped he didn't really kill his neighbors. Id. at 267.
¶ 42 A parallel. An alcoholic wants to have a drink. It fills his thoughts during the day. He even has dreams where he does take a drink. None of that means he intends to take a drink. In fact, instead of taking a drink, he attends an Alcoholics Anonymous (AA) meeting. At the meeting he says, "I want to have a drink" and perhaps even, "I've been planning to have a drink and I will sit at the third stool at the Thirsty Scholar Bar and order a Guinness and a shot of Baileys and Jameson." Under those circumstanceswhere the individual attended an AA meeting instead of going to a bar, would a reasonable person think the alcoholic seriously intended to have a drink? No. A reasonable person would recognize that the alcoholic is having persistent thoughts about drinking and that he or she is tempted to drink again. But the statements in those circumstances, if anything, express the alcoholic's intent not to have a drink, an intent not to give into temptation. So it is with Schaler who, despite his thoughts, sought help to resist a temptation he had previously been struggling with alone.
¶ 43 As a matter of law and under the circumstances presented, Schaler's statements do not constitute a true threat. He did not violate RCW 9A.46.020. Schaler may have been fighting a temptation to kill his neighbors, but being tempted to commit an action is not a violation of RCW 9A.46.020 nor, certainly, is fighting that temptation or seeking help to prevent acting upon it.
¶ 44 The facts here demonstrate the extent to which RCW 9A.46.020 has been overextended to criminalize speech that is not intended to coerce, intimidate, or humiliate a victim. Schaler's speech in the context here had everything to do with Schaler, his attempt to get help, and his admirable efforts to try to work through his problems andto the extent he was tempted to actually commit an unlawful acthis intent to resist that temptation. His speech had nothing to do with any intent to coerce, intimidate, or humiliate his neighbors. To the extent Schaler posed a danger to his neighbors or the community if released without further treatment, there is a legal mechanism (not at issue here) where a person can be civilly confined involuntarily.[1] RCW 9A.46.020 has no relation to that mechanism, nor should RCW 9A.46.020 be unconstitutionally used as a substitute.
¶ 45 As a practical matter, I cannot help but consider the ridiculous message Schaler's conviction would send to the public. How should Schaler have avoided transgressing the law? Should he have stayed at home without calling the hotline for help, hysterical after his dream and wrestling alone with his morbid and obsessive thoughts? Should he have lied to, or refrained from fully sharing his thoughts and feelings with, the professionals who were there to assess his condition and help him, undermining their ability to assess and help him? A person having a mental breakdown should not be subject to criminal charges for harassment while he seeks professional help in earnest.[2]
¶ 46 RCW 9A.46.020 is out of control and must be reined in. Although I concur with the majority's decision that Schaler's conviction should be reversed, I dissent from its holding that a new trial is warranted. This case should be remanded with instructions to the trial court to dismiss the RCW 9A.46.020 charge. The facts here fail to establish a violation of the statute as a matter of law.
J.M. JOHNSON, J. (dissent).
¶ 47 Over a four-hour period, Glen Schaler threatened to murder his neighbors Kathy *870 Nockels and Denise Busbin by strangling them with his bare hands. The two victims testified about Schaler's threatening behavior, as did law enforcement officers and a mental health specialist. The jury found that Schaler subjectively intended to communicate an intent to cause bodily injury to these victims. However, the majority holds that Schaler's conviction resulted from erroneous instructions in violation of the First Amendment. That is, Schaler may have reasonably failed to foresee that his repeated statements might be taken seriously as an expression of his intent to kill Nockels and Busbin. The facts show that failure by the trial court to include such a simple negligence mens rea instruction as to foreseeability was harmless. Further, the record reveals that Schaler was aware of this alleged instructional deficiency but did nothing to correct the problem. Schaler thus invited the very error he is complaining of, and he cannot seek reversal on the basis of that error. I dissent.

HARMLESS ERROR
¶ 48 The trial court did not include an explicit "true threat" definition in its instructions to the jury, nor was such instruction requested by Schaler. Instead, the trial court gave the jury four separate instructions that, taken together, properly conveyed every aspect of the majority's "true threat" definition except onewhether Schaler foresaw that his conduct would be taken by a reasonable person as a true threat.[1] This failure is subject to a harmless error analysis. See State v. Johnston, 156 Wash.2d 355, 364, 127 P.3d 707 (2006). "In order to hold the error harmless, we must `conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" State v. Brown, 147 Wash.2d 330, 341, 58 P.3d 889 (2002) (quoting Neder v. United States, 527 U.S. 1, 19, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). According to the majority, the court should have instructed the jury that, to convict, it had to find Schaler negligently failed to foresee that his conduct would be interpreted as a serious expression to kill Nockels and Busbin.[2] There is no reasonable doubt that the jury would have made the same finding of guilty had it received this added instruction.[3]
*871 ¶ 49 The majority suggests Schaler's conduct reasonably could be viewed as stemming from a mental breakdown or confusion. Schaler's first reports that he was covered in blood and had slit his neighbor's throat may reasonably be questioned as true threats; Schaler was very emotional, displayed anxiety-related symptoms, repeatedly referenced a dream of killing his neighbor, and stated he hoped he had not actually killed anyone. But the current criminal charges against Schaler did not arise from this behavior. The charges are based on Schaler's repeated, clear, and direct threatening statements during his hours-long stay at the hospital.
¶ 50 Schaler repeatedly stated over a four-hour period at the hospital that he wanted to kill Nockels and Busbin. He was specific about the method-strangulation with his bare hands. He gave reasons for wanting to kill the women, including the chain saw incident (that itself led to a police call) and a history of conflicts. He stated he had been thinking of and wanting to kill the women for months. He maintained this position despite a mental health specialist's efforts to dissuade him. All of this occurred after Schaler had taken his medication and been in the care of mental health specialists for hours. Schaler showed no remorse for his statements and was able to distinguish between his dream (where he thought he killed Nockels and Busbin) and reality (where he wanted to kill them with his bare hands).
¶ 51 Schaler engaged in further conduct that substantiates his willingness to engage in violent crime. Director Tonya Heller-Wilson had to call Deputy Connie Humphrey back to the hospital twice because of Schaler's behavior. While Humphrey was at the hospital trying to assist the mental health staff, Schaler threatened to start a fight and guaranteed "someone [would] get hurt."[4] Verbatim Report of Proceedings (VRP) (Feb. 6, 2007) at 220. Schaler then said that "next time he was going to get a bunch of guns, and it would be [a] blood bath." Id.
¶ 52 Prior history also shows reason to perceive the threats as real. On June 1, 2005, Schaler had cut a row of the Busbins' fruit trees with a chain saw. When Nockels asked Schaler to stop, he raised the chain saw toward her and told her not to interfere. In response to a 911 call by Nockels, Deputy Blake arrived and Schaler stated that someone was going to die. Asked to explain himself, Schaler said that "when he became angry, he did feel like that he wanted to kill someone, and that that was a natural human response." VRP (Feb. 6, 2007) at 291.
¶ 53 Shortly thereafter Nockels and Busbin obtained restraining orders against Schaler from a court. Within days, Schaler violated at least one such order. Further, after threatening Nockels and Busbin's lives on August 10, Schaler ran Nockels' car off the road with his car.
¶ 54 Nockels and Busbin believed Schaler's threats on June 1 and August 10 were genuine and had to adjust their lives in response. Heller-Wilson felt Schaler's August 10 threats were genuine and properly exercised her discretion to warn those threatened. Although Schaler tried to invoke the patient-mental health counselor privilege to dismiss the charges or prevent Heller-Wilson from testifying, the trial court properly found that Heller-Wilson was statutorily justified in warning Nockels and Busbin and contacting the authorities. See RCW 18.225.105(5); RCW 71.05.390(10). Schaler did not appeal this decision. The jury found Schaler subjectively intended to communicate an intent to cause bodily injury to Nockels and Busbin and that they were placed in reasonable fear that Schaler's threats would be carried out. As we recognized in Kilburn, Nockels and Busbin's reasonable belief that Schaler communicated a true threat carries the same effect as a finding that Schaler should have reasonably foreseen that his statements would be taken as true threats.[5]Kilburn, 151 Wash.2d at 45 n. 3, 84 P.3d 1215.
*872 ¶ 55 There is no reasonable doubt the jury would have found a person in Schaler's position at least negligent in failing to foresee that his conduct would be taken as a true threat. Schaler made repeated, detailed death threats against specific victims who each had protection orders against him. He clearly and emphatically rejected attempts to dissuade him. He was aggressive and displayed disrespect for police officers and court orders. A reasonable person in Schaler's place would understand that his conduct would be taken as a true threat.
¶ 56 The policies embodied by the majority's opinion are disturbing. First, everyone in this case (except Schaler) did exactly what they were supposed to do. Nockels and Busbin obtained restraining orders. Heller-Wilson probed Schaler's mental state and the seriousness of his death threats for hours before warning Schaler's victims. Deputy Humphrey assisted Schaler at his home, convinced Schaler to take his medication, and took him to the hospital. Yet the majority declares this was not enough to justify the State acting to protect Nockels and Busbin, despite conduct that clearly signaled danger to their lives.
¶ 57 Second, the majority's reliance on Schaler dealing with the mental health expert as support for its conclusion may suggest that Heller-Wilson did not act appropriately in warning the victims or contacting the police. Sound policy favors candor between a therapist and patient, but the legislature has expressly provided deference to therapists' professional judgment. The trial court denied Schaler's motion to exclude statements made to Heller-Wilson from evidence due to the patient-mental health counselor privilege. Schaler did not appeal that decision, and we may not question it here. Heller-Wilson felt Schaler's threats were serious enough to warrant intervention, and her judgment is entitled to great deference; lives may depend on it. Today's decision unfortunately may dissuade some therapists from appropriate protective reporting.

INVITED ERROR
¶ 58 Schaler's conviction should also be affirmed because Schaler invited the error alleged. Schaler argues that the trial court erroneously failed to provide an explicit true threat instruction. However, Schaler did not object to the "threat" instruction given by the trial court or propose an alternate threat instruction despite being clearly cognizant of the supposed shortcoming.[6] Schaler thus invited the error he is complaining about.
¶ 59 Under the doctrine of invited error, a party cannot set up an error and then complain about it on appeal. State v. Momah, 167 Wash.2d 140, 153-54, 217 P.3d 321 (2009); State v. Aho, 137 Wash.2d 736, 744-45, 975 P.2d 512 (1999); State v. Henderson, 114 Wash.2d 867, 870, 792 P.2d 514 (1990) (quoting State v. Boyer, 91 Wash.2d 342, 344-45, 588 P.2d 1151 (1979)). This doctrine applies to alleged constitutional violations. See Momah, 167 Wash.2d at 145, 217 P.3d 321 (public trial right); Henderson, 114 Wash.2d at 869, 792 P.2d 514 (due process); F.T.C. v. Accusearch Inc., 570 F.3d 1187, 1204 (10th Cir.2009) (equal protection and free speech).[7]
¶ 60 The invited error doctrine often arises in the context of parties assigning error to jury instructions they proposed. However, the doctrine is applicable in other contexts. We recently held in Momah that a defendant could not complain about court closure during part of voir dire because the defendant "affirmatively assented to the closure, argued for its expansion, had the opportunity to object but did not, actively participated in it, and benefited from it." Momah, 167 Wash.2d at 151-52, 217 P.3d 321.
*873 ¶ 61 Before trial, Schaler moved the court to suppress evidence and dismiss the charges. Key to the motion was this court's true threat definition in Kilburn and the argument that Schaler could not reasonably have foreseen his conduct would be interpreted as a true threat. Schaler was thus aware of this court's legal definition of a true threat and argued the importance of the foreseeability aspect the majority discusses. However, Schaler never objected to the trial court's threat definition and never proposed an instruction including foreseeability. The majority now reverses based on an alleged error Schaler knew of but made no effort to cure.
¶ 62 Although Schaler did not propose a faulty instruction, he actively participated in determining the jury instructions and did not object to any relevant instructions; instead, he assented to them. He thus successfully created the very situation the invited error doctrine is designed to prevent: he tries the case and gets a jury verdict; then, if losing, he gets a new trial. We should not condone this strategy.

CONCLUSION
¶ 63 There is no doubt that a reasonable person would have foreseen Schaler's statements at the hospitalthat he would murder his neighbors by strangulationwould be understood as a true threat. Any error by the trial court in failing to include a foreseeability jury instruction is therefore harmless. Further, Schaler consciously declined to correct the alleged error he now complains of. I would affirm Schaler's conviction. I dissent.
WE CONCUR: SUSAN OWENS, Justice.
NOTES
[1] Heller-Wilson's co-worker received Schaler's call and then forwarded it on to Heller-Wilson due to her higher level of experience.
[2] Under certain circumstances, a mental health counselor has a duty to warn those whom the counselor's patient may harm. See generally Petersen v. State, 100 Wash.2d 421, 671 P.2d 230 (1983).
[3] The First Amendment requires only simple negligence, not "criminal negligence," as to the result. Cf. RCW 9A.08.010(1)(d) (defining "criminal negligence" as the failure to be aware of a "substantial risk," which constitutes a "gross deviation" from reasonable care in the situation).
[4] Justice J.M. Johnson's dissent argues that our holding is at odds with Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), in which the United States Supreme Court upheld a cross burning law without discussing any negligence requirement. Dissent (J.M. Johnson, J.) at 870 n.1. But, the law at issue in Black required an even greater mens rea as to the listener's fear. Black, 538 U.S. at 360, 123 S.Ct. 1536 ("Intimidation ... is a type of true threat[ ] where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." (emphasis added)).
[5] Although the instructions in this case erroneously failed to limit the statute's scope to "true threats," the problem is unlikely to arise in future cases. After our opinion in Johnston limited the bomb threat statute's scope to "true threats," the Washington Pattern Jury Instructions Committee amended the pattern instruction defining "threat" so that it matches the definition of "true threat." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.24, at 72 (3d ed. 2008) ("To be a threat, a statement or act must occur in a context ... where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat...."). Cases employing the new instruction defining "threat" will therefore incorporate the constitutional mens rea as to the result.
[6] The situation is not identical to omitted-element cases. Whether the constitutionally required mens rea is an "element" of a felony harassment charge is a question that we need not decide. (We note that there is a Court of Appeals opinion on point, State v. Tellez, 141 Wash.App. 479, 170 P.3d 75 (2007), but we express no opinion on the matter.) It suffices to say that, to convict, the State must prove that a reasonable person in the defendant's position would foresee that a listener would interpret the threat as serious. So, it is useful to consider other cases in which something that the State had to prove to convict was omitted from the jury instructions.
[7] Justice J.M. Johnson's dissent revives the debate over a speaker-centric versus a hearer-centric, true threat requirement, arguing that the difference is minimal and matters only in cases in which the victim has an unusual sensitivity. See dissent (J.M. Johnson, J.) at 870 n.2, 871-72. While the standards may yield no meaningful difference in many cases, in this case the difference is not academic. Here, there was a genuine issue of whether a reasonable person in Schaler's position would foresee that threats he uttered to a mental health counselor while receiving medical care, which referred to third parties not present, would be interpreted as serious expressions of intent to harm those third parties. Indeed, the dissenting opinions in this case illustrate that reasonable minds can differ on this question, confirming that it should have been submitted to the jury. Compare dissent (J.M. Johnson, J.), with concurrence and dissent (Sanders, J.).
[8] Justice J.M. Johnson's dissent criticizes the "policies" behind our holding, arguing that the victims and therapist in this case "did exactly what they were supposed to do," yet our opinion "declares this was not enough to justify the State acting to protect Nockels and Busbin, despite conduct that clearly signaled danger to their lives." Dissent (J.M. Johnson, J.) at 872. This argument misdescribes our opinion. At no point do we fault Heller-Wilson for warning Nockels and Busbin, nor do we fault their feeling frightened as a result, nor do we criticize the State for bringing charges. Where we find fault is in the inaccurate jury instructions, which could have allowed the jury to reach a guilty verdict without finding a constitutionally required fact. This error was not harmless because, even though the evidence supported finding the fact, the evidence was controverted. We are not motivated by any policy against the justifiable acts of the therapist, victims, or prosecutor. The only policies in play are those enshrined in the constitutional right to trial by jury and proof beyond a reasonable doubt.
[1] I do not question whether Director Heller-Wilson should have informed authorities or Schaler's neighbors of Schaler's statementsan issue neither dictated by RCW 9A.46.020 nor raised here.
[2] I am not suggesting that statements made during therapy can never constitute a true threat. As a clear violation, a patient could make threats against another to his or her therapist, intending to harass or humiliate the target because he or she knew the therapist would relay those threats. Statements made in therapy are not shielded from RCW 9A.46.020, but the constitution requires that the statements be analyzed under the context and circumstances in which they are made. See Williams, 144 Wash.2d at 207-08, 26 P.3d 890. Schaler's statements, in light of the surrounding circumstances, do not constitute a true threat as a matter of law.
[1] This court first adopted a foreseeability requirement for First Amendment true threat analysis in State v. Williams, 144 Wash.2d 197, 207-08, 26 P.3d 890 (2001) and State v. J.M., 144 Wash.2d 472, 477-78, 28 P.3d 720 (2001). After Williams and J.M., the United States Supreme Court decided Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). In Black, the Court found the following statute constitutional under the First Amendment:

It shall be unlawful for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place.
Black, 538 U.S. at 348, 123 S.Ct. 1536 (emphasis added). The Court noted at length that the type of intimidation likely to accompany a cross burning was that of bodily harm or death. Id. at 348-58, 123 S.Ct. 1536. No pseudo-element of foreseeability was required for the statute to pass constitutional muster; the actor's intimidation intent was dispositive. Our jurisprudence suggesting that the First Amendment requires foreseeability in a true threat analysis thus conflicts with the United States Supreme Court's First Amendment jurisprudence.
[2] We have stated that the "reasonable person" inquiry as to whether a statement would be foreseen as a threat is "an objective standard that focuses on the speaker." State v. Kilburn, 151 Wash.2d 36, 44, 84 P.3d 1215 (2004). We declared the test was speaker-centric without citation to any authority. Id. The statute and jury instructions here, in contrast, employed a listener-centric test. The difference is often semantic. As we recognized in Kilburn, the Eighth Circuit of the United States Court of Appeals has explained "that in the vast majority of the cases the outcome should be the same because a reasonably foreseeable response from the listener and an actual reasonable response should be the same. The court foresaw that the only case where there might be a different outcome is where the recipient suffers from some unique sensitivity unknown to the speaker." Id. at 45 n. 3, 84 P.3d 1215 (citing Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 623 (8th Cir. 2002)). Further, a listener-centric test more directly addresses the first two of the majority's three significant state interests in restricting true threats: protecting individuals from fear of violence, preventing the disruption that fear engenders, and reducing the possibility the threatened violence will occur. Majority at 862-63 (citing J.M., 144 Wash.2d at 478, 28 P.3d 720).
[3] The standard is simple negligence, not criminal negligence. Id. at 864-65. As negligence is a lesser mens rea standard than recklessness, knowledge, or intent, a jury's finding as to any of those mental states would also support a true threat conviction.
[4] Despite Schaler's subsequent statement about his prior back and neck injuries, Deputy Humphrey viewed this threat as serious enough to call for backup.
[5] Had the jury been instructed to consider "some unique sensitivity unknown to the speaker," then Nockels and Busbin's reasonable belief might not comport with Schaler's reasonable belief. Kilburn, 151 Wash.2d at 45 n. 3, 84 P.3d 1215. There is no evidence in this case of the victims having any unique sensitivities.
[6] In contrast, Schaler did object to instruction 11, which required the State to prove that the victims were aware of the threat but not that Schaler knew the threat would be communicated to them. Schaler also proposed an instruction defining the term "knowing."
[7] Ineffective assistance of counsel claims are the exceptions to the rule. See Aho, 137 Wash.2d at 744-45, 975 P.2d 512; State v. Gentry, 125 Wash.2d 570, 646-47, 888 P.2d 1105 (1995). This exception is not relevant here because Schaler makes no such claim.