# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51814-7-II |
| Respondent, | |
| v. | |
| MARSHALL JAY LEWIS, | UNPUBLISHED OPINION |
| Appellant | |

SUTTON, J. — Marshall Jay Lewis appeals his convictions for first degree arson, residential burglary, cyberstalking, and telephone harassment, all domestic violence offenses, for repeatedly texting and calling his ex-girlfriend, breaking into her home, and setting it on fire. He also challenges the trial court's imposition of several legal financial obligations (LFOs) and claims they are discretionary LFOs. Lewis argues that (1) the trial court violated his First Amendment right by failing to instruct the jury on the definition of "true threat" for the cyberstalking and telephone harassment charges, (2) the trial court erred by denying his CrR 8.3(b) motion to dismiss for government misconduct related to the late disclosure of a report investigating the cause of the fire, (3) the trial court erred by admitting his cell phone records because they were not properly authenticated and he was prejudiced, (4) the cyberstalking statute, RCW 9.61.260, is overly broad and void for vagueness, and thus, is unconstitutional, and (5) the trial court erred by imposing various LFOs.

We hold that (1) the trial court erred by failing to instruct the jury on true threat to injure, and this error was not harmless beyond a reasonable doubt, (2) the trial court did not err by denying the motion to dismiss as Lewis was not prejudiced by the continuance, (3) the trial court did not err by admitting the Verizon Wireless records because they were properly authenticated, and Lewis was not prejudiced, (4) RCW 9.61.260 is not unconstitutionally overly broad or void for vagueness, and (5) the court erred by imposing the LFOs without determining whether Lewis is indigent under the current statutes. Thus, we affirm the convictions for first degree arson and residential burglary, but we reverse Lewis's convictions for cyberstalking and telephone harassment and remand for further proceedings. We reverse the LFOs, and we remand for the court to conduct a proper inquiry under the current LFO statutes prior to imposing LFOs.

FACTS

I. BACKGROUND

Lewis and Kasey Cross were in a long-distance relationship—Lewis lived in Sedro Wooley, Washington, and Cross lived in Beaver, Washington. After their relationship ended in August of 2015, Lewis continued to contact Cross. That December, Lewis began texting Cross asking what her plans for Christmas and New Year's Eve were. Cross did not inform Lewis that she would be in Florida for a few days during the holidays.

On December 31 at about 12:40 pm, Lewis was intoxicated and began texting Cross that he and his friends were coming to her house in Beaver; he continued to text her until January 1, 2016 at about 8:30 am.

At approximately 12:40 pm on December 31, 2015, Lewis and Cross had the following text message exchange:

2

> Lewis: Well I'm on my way over that way. With the air mattress. My 3 friends want to know if you want to meet them
>
> Lewis: Wanna make $400 buck today
>
> Cross: I don't want the air mattress back
>
> Lewis: Wanna make $400 buck today
>
> Cross: I'm good
>
> Lewis: It's easy money
>
> Cross: No. Leave me alone
>
> Lewis: Come on alls you have to do is just let my friends and I pass you around and f**k you all night. I mean you're a whore right might as well get paid plus bring in the new year getting f****d over and over multiple times. See you at court in a couple weeks. Love you
>
> Lewis: Or we will see you at bbq tonight
>
> Lewis: Love you

Exhibits 39-40.

About thirty minutes later, Lewis texted, "I'll be in town tomorrow with some friends don't want you to feel awkward[.]" Ex. 41.

At 12:54 am on January 1, 2016, Lewis texted, "You want this air mattress[.]" Ex. 41. Almost two hours later, Lewis texted, "Hope you had a good day. Goodnight[.]" Ex. 41. Two hours later, Lewis texted, "You're never gonna talk to me again[.]" Ex. 41. At 4:46 am, Lewis texted, "Where you at the whore. We [s]ee your house wanna f**k or what[.]" Ex. 42. Just over one hour later, Lewis texted, "We are outside[.] Your loss[.] Hey are all of hooking up or not[.]" Ex. 42. Here, Lewis also sent Cross a picture of a naked woman. Lewis proceeds to say, "Cause I'm f*****g this then[.] We see your car are you not answering[.] You're done[.] Every guy in forks has seen you[.] Outside your house[.] Hello[.]" Ex. 43. Two and a half hours later, Lewis texts, "Kasey we are outside your house want us to come in[.] You better text me or call me in the morning[.]" Ex. 43.

3

Lewis also called Cross 38 times between 2:55 am and 6:11 am on January 1, and left her two voicemails. In the first voicemail, Lewis said,

> One, I just want to say, I love you. I really do, actually. Happy New Year. I don't wish anything bad towards you. I really do love you, even though you're probably out getting f****d by some guy or a couple guys, but I do love you, but I want you to call me today, so yeah, get good rest and call me. All right, love you, bye.

Clerk's Papers (CP) at 191; Verbatim Report of Proceedings (VRP) (Mar. 28, 2018) at 482.

Lewis left a second voicemail after a man answered his next call to Cross. In the second voicemail, Lewis said,

> Kasey, if you don't call me in the morning when you go to see your kids, we're gonna follow you. I want to know who the f**k was that guy who answered your phone. I don't give a f**k, you call me in the morning when you get this goddamn message, when you go to see your kids or we're gonna follow you when you meet your kids.

CP at 192; VRP (Mar. 28, 2018) at 482.

The morning of January 1, Lewis took a ferry from the Edmonds terminal to the Kingston terminal. He then drove to Cross's house in Beaver. Finding that Cross was not home, Lewis broke into her house, drank some of her vodka, and set fires using gasoline in two separate locations in her house.

The State charged Lewis with first degree arson, residential burglary, cyberstalking, and telephone harassment, all with domestic violence allegations.

The cyberstalking charge alleged,

> On or about the 1st day of January, 2016, in the State of Washington, [Lewis] with intent to harass, intimidate, torment, or embarrass any other person, and under circumstances not constituting telephone harassment, made an electronic communication to such other person or a third party either using lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act; and/or anonymously or repeatedly whether or not

4

conversation occurs; and/or threatening to inflict injury on the person or property of the person called or any member of his or her family or household . . . .

CP at 154. The telephone harassment charge alleged,

On or about the 1st day of January, 2016, in the State of Washington, [Lewis] with intent to harass, intimidate, torment, or embarrass any other person, made a telephone call to such other person or a third party either using any lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act; and/or anonymously or repeatedly or at an extremely inconvenient hour, whether or not conversation occurs; and/or threatening to inflict injury on the person or property of the person called or any member of his or her household . . . .

CP at 155.

## II. FIRE INVESTIGATION REPORTS

During the fire investigation, two reports were prepared: the "Davis Report" by private fire investigator Lynn C. Davis and the "Barnes Report" by Clallam County Fire Protection District No. 1 Captain Justice Barnes. The Davis Report was written on January 13, 2016, and the Barnes Report was written on April 11, 2016. Davis has been a private fire investigator for 24 years. Barnes is a volunteer with the Clallam County Fire District No. 1 with three years of experience as an investigator; at the time he investigated the fire at issue, he had only investigated two or three fires.

Davis interviewed Barnes and Cross, and he examined the house. During his interview with Barnes, Barnes indicated to Davis that the fire "appeared suspicious," and that he "turned over [his] investigation to the Clallam County Sheriff's Office." CP at 210. In his interview with Cross, Cross informed Davis about her tumultuous relationship with Lewis and that Lewis had been sending her "harassing text messages." CP at 210. Davis conducted a thorough inspection throughout the entire house. In his report conclusions, Davis stated that "Barnes[] determined that

5

the fires were intentionally set and has turned over the follow-up investigation to Clallam County Sheriff's Office," and that the fire had been intentionally set in two separate locations in Cross's house. CP at 211-12.

Barnes worked with the Clallam County Sheriff's Office during his investigation of the house. He thoroughly inspected the entire house. Barnes also used the Davis Report in making his determinations. In his report he concluded that with the information available to him, the cause of the fire was undetermined. Barnes did conclude, however, that there were two points of origin for the fire inside the house.

### III. MOTION TO DISMISS FOR GOVERNMENTAL MISCONDUCT

On January 18, 2018, four days before Lewis's trial was set to start and more than one month before Lewis's speedy trial period expired, the State received the Barnes Report during its interview with Barnes. The State then "promptly provided [it] to the defense." CP at 108.

Lewis's counsel made it clear that he did not believe the State's late disclosure of the Barnes Report resulted from an intentional delay by the State. Lewis requested a continuance and informed the trial court that he intended to file a motion to dismiss based on government misconduct, which motion he filed.[1] Lewis argued that his right to a fair trial was violated and that he was prejudiced by the State's late disclosure of the Barnes Report four days before trial. He asked the court to dismiss the case pursuant to CrR 8.3(b) and *Brady v. Maryland*.[2] The trial court held a hearing on the motion.

---

[1] In his motion to dismiss, Lewis did not explicitly say what charges he sought to have dismissed— whether it was just the arson charge or all four of the charges.

[2] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Following the hearing, the trial court entered the following findings of fact:

1.  An information was filed January 27, 2016.

2.  Count I of the information charged the defendant, Marshall Jay Lewis, with Arson in the First Degree-Domestic Violence.

3.  Trial was originally set on February 5, 2016 for March 21, 2016.

4.  The trial date was continued nine (9) more times, many of which were at the request of the Defendant.

5.  "Capt. J. Barnes" of "Clallam County Fire District # 1" was identified in the State's Omnibus application filed February 19, 2016.

6.  The State also filed witness lists on the following dates in which "Justice Barnes, CCFD" was listed: April 1, 2016; April 11, 2016; December 16, 2016; and December 22, 2016.

7.  One of the trial settings was for January 22, 2018 by agreement of the parties.

8.  On January 13, 2016, Lynn Davis, on behalf of C&O Service, Inc., wrote an insurance report regarding the fire with which the defendant was charged. In the report, [he] identifies Justice Barnes of the Clallam County Fire District as an interviewee "responsible for the investigation of the fire." [He] concluded that "the fire was investigated by CCFD #1. Their Fire Marshall, Justice Barnes, determined that the fires were intentionally set and has turned over the follow-up investigation to Clallam County Sheriff's Office." The Court was informed at oral argument on the Defendant's Motion to Dismiss that the Defense received the Davis insurance report 4-6 months after the information was filed.

9.  On January 18, 2018, the State received the report of the fire investigation conducted by Captain Barnes of the Clallam County Fire District. The report was promptly provided to the defense.

10.  In the report, Justice Barnes identified himself as a Captain/Fire Investigator. He concluded, in part, that "with the current information, the ignition source and the points of origin are unknown. Until additional evidence is provided the cause of the two fires is undetermined."

11.  On January 19, 2018, the defendant advised the court of the receipt of new evidence and also advised that he would need additional time to investigate the new evidence. The matter was set over to February 2, 2018 for "resolve/reset." That hearing was reset to February 9, 2018 as the defense had not yet had the new evidence investigated.

12.  On February 9, 2018 the court set trial for March 26, 2018, and the defendant advised the court that he "wishe[d] to file a Motion to Dismiss based on discovery."

13.  The defendant filed a Motion to Dismiss on March 15, 2018 and it was argued on March 19, 2018.

CP at 107-09 (footnote and internal citations omitted).

Based on the findings of fact, the court ruled that (1) the Barnes Report was favorable to the defendant because it could have been used for impeachment, (2) the evidence could have been discovered but for lack of due diligence by the defense, and (3) there was no prejudice to Lewis.

The trial court entered the following conclusions of law and denied the motion:

1.  In *Brady* . . . the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In subsequent years, the Supreme Court expanded the *Brady* rule's reach to include (1) favorable evidence even if not requested by the defendant, (2) impeachment evidence, and (3) evidence possessed by law enforcement.

2.  To establish that the prosecution violated its obligations under *Brady*, a defendant must demonstrate the existence of each of three necessary elements: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.

3.  With respect the third element of a claim under *Brady*, "'[t]he terms "material" and "prejudicial" are used interchangeably. . . .'" Evidence is "prejudicial" or "material" "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" A "reasonable probability" is shown if the suppression of the nondisclosed evidence "'undermines confidence in the outcome of the trial.'" The less exacting standard of "reasonable probability does *not* require a defendant to demonstrate that "the evidence if disclosed *probably* would have resulted in acquittal."

4.  The first *Brady* element has been satisfied. The Barnes report was favorable to the defendant. It could have been used for impeachment inasmuch as the Davis insurance report stated that "Justice Barnes determined that the fires were intentionally set . . ." However, the Barnes report concluded that, in the absence of additional evidence, "the ignition source and points of origin [of the fires] are unknown" and "the cause of the two fires is undetermined."

5.  The second *Brady* element has not been satisfied. Evidence that could have been discovered but for lack of due diligence is not a *Brady* violation." Here, the Barnes

report was referenced in the Davis insurance report that the defendant conceded in argument on the motion receiving about 4-6 months after the information was filed. Thus, the defendant was put on inquiry notice of the existence of the Barnes report and could have acquired the report through the exercise of due diligence.

6. Inasmuch as there was no suppression of the Barnes report by the State, the third *Brady* element has not been satisfied. It appears that prejudice is premised upon suppression and, if there is no suppression, there is, *ipso facto*, no prejudice. Even if the prejudice element stands alone, there is no probability that the result would have been different. The Barnes report did not exculpate the defendant; it simply drew no conclusions on the cause of the fires in the absence of further investigation. At best, it could have been used to impeach the Davis insurance report's statement that the Barnes report concluded that the fires were intentionally set.

CP at 109-11 (alterations in original) (internal citations omitted).

## IV. TRIAL TESTIMONY

The case proceeded to trial. The trial testimony and evidence presented are consistent with the facts discussed above.

The State presented testimony from Cross's mother, Charlene Cross, who was housesitting for Cross when Cross was away in Florida. Cross's mother testified that she was at the house New Year's Eve around 3:00 pm, and that there was no gas can on the back porch and the front door was in fine condition when she left.

The State also presented testimony from Bob Stark, the man who saw the fire and called the fire department. He testified that it appeared to be a burglary because the glass on the door was damaged. Stark also stated that when he went to the backyard, he saw a gas can sitting on the back porch.

The State presented testimony from seven members of law enforcement, who testified regarding their investigation of the house, the crimes, and the interview with Lewis once he was arrested. Detective Amy Bundy testified regarding her interview with Lewis after his arrest, during

which she said Lewis disclosed to her that he had texted Cross on New Year's Eve and that he had been intoxicated while sending those messages.

The State also moved to admit the taped recording of Lewis's interview following his arrest, which motion the trial court granted. The State presented testimony from two forensic scientists: the scientist who tested the DNA on the vodka bottle and on the gas can against Lewis's DNA, and the scientist who tested the liquid from the gas can to determine its chemical makeup.

In addition, the State presented evidence of Lewis's whereabouts on December 31, 2015, and January 1, 2016, including surveillance video showing that Lewis had taken the ferry from Edmonds to Kingston the morning of January 1, 2016. The State also presented evidence of Lewis's whereabouts through his Verizon Wireless cell phone records.

Lewis objected to the admission of the cell phone records showing his phone usage and which cell towers were used to pick up his cell phone calls on the evening of the crimes. Lewis argued that these records, which were Microsoft Excel spreadsheets, were not unique in design and could easily have been forged.

In response to the objection, the State asked the witness, Joseph Ninete, a Verizon Wireless employee, a number of questions regarding his knowledge of the documents. Ninete had been working for Verizon for five years, and he testified that he acted as "the custodian of records for all [Verizon's] records." VRP (Apr. 2, 2018) at 650. Ninete testified that he was familiar with how Verizon collects data, and he testified extensively regarding this process. VRP (Apr. 2, 2018) at 684 (testifying that he had testified "over 1,000" times). Ninete testified that he recognized the records related to Lewis's cell phone account because of the format and contents of the document, and because it was consistent with the types of documents typically sent in response to subpoenas.

10

The court also asked Ninete questions related to the foundation for these records. After determining that the records were properly authenticated, the trial court admitted the records over Lewis's objection.

Captain Barnes also testified. Barnes stated that he was first called onto the scene for fire suppression, but that his role changed to fire investigator when he determined the fire may have been caused by criminal activity. Barnes admitted that had he reviewed additional materials in making his determination, that his earlier conclusion—that the cause of the fire was undetermined—may have been affected. Barnes also testified that he was unaware of any accelerant present at the scene and did not know that gasoline was found near the house.

Cross also testified. She testified that she had initially connected with Lewis over Facebook in 2014 and that they had a dating relationship. Lewis began to verbally and mentally abuse her, calling her a "white bitch," complaining about her looks, and stating that she was "nothing better than a f**k toy." VRP (Mar. 28, 2018) at 459. Lewis eventually moved to be nearer to her, but their relationship ended in August 2015, although he continued to contact her and often asked to get together. According to Cross, the last time Lewis was at her house was in July 2015.

As to the events on New Year's Eve, Cross testified that Lewis texted her on December 31, 2015, claiming he was coming over with three friends to pass her around and "f**k" her, calling her a "whore." VRP (Mar. 28, 2018) at 470. After receiving this text, she felt disgusting, sickened, and afraid. Cross identified screen shots of the texts dated December 31, 2015, which were admitted into evidence.

Cross stated that she contacted the Clallam County Sheriff's Office because Lewis claimed he was coming to her house with some friends. On the morning of January 1, 2016, she woke up to find 38 missed phone calls and two voicemail messages from him. These texts and phone calls were admitted into evidence as exhibits 39 through 43. When asked about the bottle of vodka that contained Lewis's DNA, Cross testified that she had not purchased that bottle until December 2015, five months after Lewis had last been at her house with her. She also testified that she kept the gas can in her storage shed and that she had not used it since the summer of 2015.

## V. JURY INSTRUCTIONS

The trial court's to-convict instruction[3] for the cyberstalking charge stated:

> To convict the defendant of cyberstalking in Count III, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about January 1, 2016, the defendant made an electronic communication to another person;
>
> (2) That at the time the defendant made the electronic communication, the defendant intended to harass, intimidate, torment, or embarrass any other person;
>
> (3) That the defendant:
>
>> (a) used lewd, lascivious, indecent, or obscene words, images, or language in the electronic communication, or
>>
>> (b) threatened to inflict injury on the person or property of the person to whom the electronic communication was made; and
>
> (4) That this act occurred in the State of Washington.
>
> If you find from the evidence that elements (1), (2), and (4), and any of the alternative elements (3)(a) or (3)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of the alternatives (3)(a) or (3)(b) has

---

[3] Lewis's counsel objected to this instruction.

been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

CP at 134.

The trial court's to-convict jury instruction for the telephone harassment charge stated:

To convict the defendant of telephone harassment in Count IV, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about January 1, 2016, the defendant made a telephone call to another person;

(2) That at the time the defendant initiated the phone call the defendant intended to harass, intimidate, torment, or embarrass any other person;

(3) That the defendant:

(a) used lewd, lascivious, indecent, or obscene words or language in the telephone call, or

(b) called repeatedly or at an extremely inconvenient hour, whether or not a conversation occurred; or

(c) threatened to inflict injury on the person or property of the person called; and

(4) That this act occurred in the State of Washington.

If you find from the evidence that elements (1), (2), and (4), and any of the alternative elements (3)(a), (3)(b), or 3(c) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (3)(a), (3)(b), or 3(c) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

CP at 137.

The trial court's instruction to the jury defined "threat" as,

[T]o communicate, directly or indirectly, the intent to cause bodily injury in the future to the person threatened or to any other person, to cause physical damage to the property of a person other than the actor, or to do any other act that is intended

13

to harm substantially the person threatened or another with respect to that person's health, safety, business, financial condition, or personal relationships.

CP at 136.[4]

Lewis did not propose a jury instruction defining true threat, nor did he object to the court's instruction defining threat.

The jury found Lewis guilty of first degree arson, residential burglary, cyberstalking, and telephone harassment, all domestic violence offenses.

## VI. LFOs

Following the jury's verdict, the trial court imposed LFOs as follows: a $100 crime laboratory fee, a $100 DNA[5] collection fee, a $500 court appointed counsel reimbursement fee, a $200 criminal filing fee, and a $100 domestic violence assessment.[6] Prior to imposing the LFOs, the court relied on the prosecutor's and Lewis's counsel's statements that Lewis had previously worked for 60 hours a week as a chef.

---

[4] The Washington Pattern Jury Instruction (WPIC) 2.24 includes a second paragraph defining true threat, stating,

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in [jest or idle talk] [jest, idle talk, or political argument].

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.24, at 80 (4th ed. 2016). The court's instruction did not include this paragraph.

[5] Deoxyribonucleic acid.

[6] The court also imposed a $500 victim assessment, not at issue on appeal.

When examining the LFOs, the trial court stated,

> I usually go into a *Blazina*[7] analysis and talk about what you'd be able to pay in regard to financial obligations, but your counsel indicated that you have an extensive occupational history, that you're able to work as a chef and that you work 60 hours a week, so to me that means that you would be able to pay legal financial obligations. It's indicated in your own response to the prosecutor's recommendations for sentence. So, clearly I can find that you have the ability to pay legal financial obligations.

VRP (May 8, 2018) at 992. The court also found Lewis indigent for trial and indigent for appeal.

The trial court entered the judgment and sentence on May 8, 2018.

Lewis appeals his convictions and the court's imposition of the LFOs.

## ANALYSIS

### I. TRUE THREAT

Lewis first argues that the trial court erred by failing to instruct the jury on the definition of "true threat" for the cyberstalking and telephone harassment charges and that this failure violated his First Amendment[8] right. The State concedes that the jury was not instructed on the definition of true threat. It argues, however, that a true threat is not an essential element of cyberstalking and telephone harassment and that the error was harmless because there was sufficient evidence for any rational trier of fact to conclude beyond a reasonable doubt that Lewis's actions amounted to a true threat because "no reasonable person would take Lewis's threats to gang rape Cross to be made out of jest or idle talk." Br. of Resp't at 14. We agree with Lewis and hold that the trial court's failure to give an instruction defining true threat was not a harmless error.

---

[7] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

[8] U.S. Const. amend. 1.

A.  STANDARD OF REVIEW

We review an erroneous jury instruction for constitutional harmless error.  *State v. Lundy*, 162 Wn. App. 865, 871-72, 256 P.3d 466 (2011).  "We engage in independent review of the record in First Amendment cases 'so as to assure . . . that the judgment does not constitute a forbidden intrusion on the field of free expression.'"  *State v. Schaler*, 169 Wn.2d 274, 282, 236 P.3d 858 (2010) (internal quotation marks omitted) (quoting *State v. Kilburn*, 151 Wn.2d 36, 49-50, 84 P.3d 1215 (2004)).

B.  MANIFEST ERROR AFFECTING A CONSTITUTIONAL RIGHT

Because Lewis did not object to the jury instructions at issue, we must first address whether he has waived this issue.

RAP 2.5(a)(3) provides that "[t]he appellate court may refuse to review any claim of error which was not raised in the trial court.  However, a party may raise the following claimed errors for the first time in the appellate court . . . manifest error affecting a constitutional right."  "To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error is manifest and (2) the error is truly of constitutional dimension."  *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).  Next, "[i]f a court determines the claim raises a manifest constitutional error, it may still be subject to a harmless error analysis."  *O'Hara*, 167 Wn.2d at 98.

"An error is 'manifest' if it had practical and identifiable consequences in the case."  *Schaler*, 169 Wn.2d at 282-83.  This is also referred to as "actual prejudice."  *O'Hara*, 167 Wn.2d at 99.

16

> [T]he focus of the actual prejudice [analysis] must be on whether the error is so obvious on the record that the error warrants appellate review. . . . Thus, to determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error.

*O'Hara*, 167 Wn.2d at 99-100 (internal foot note and citation omitted). "This analysis is distinct from deciding whether the error was harmless and therefore does not warrant reversal." *Schaler*, 169 Wn.2d at 284.

For the reasons explained below, we consider Lewis's claim on the merits and conclude that the alleged constitutional error constitutes a manifest constitutional error. RAP 2.5(a)(3).

C. FAILURE TO GIVE TRUE THREAT DEFINITION

Lewis argues that the trial court's failure to instruct the jury on the definition of "true threat" to injure Cross violated his First Amendment right because without such a definition, the jury could convict him based on his protected speech. The State concedes that the trial court did not instruct the jury on the definition of true threat, but it argues that the error was harmless beyond a reasonable doubt.[9] The State cites to *State v. Allen*,[10] which held that a true threat is not an essential element of harassment statutes and is only definitional.[11] We agree that a true threat is

---

[9] The WPIC committee amended the pattern jury instruction, WPIC 2.24, defining "threat" following the decision in *State v. Johnston*, 156 Wn.2d 355, 127 P.3d 707 (2006) and the amended WPIC 2.24 now defines "threat" to match the definition of "true threat." In *Schaler*, 169 Wn.2d at 287-88 n.5, the court stated that "[c]ases employing the new instruction defining "threat" will therefore incorporate the constitutional means rea as to the result."

[10] 176 Wn.2d 611, 629, 294 P.3d 679 (2013).

[11] *Allen* is a plurality of four justices; however, Justice Chambers' concurring opinion, joined by Justice Fairhurst, expressed agreement with the lead opinion that "'true threat' need not be pleaded in the information or included in the 'to convict' instruction." *Allen*, 176 Wn.2d at 634 (Chambers, J., concurring).

not an essential element of the charges. However, we agree with Lewis that the trial court's failure to instruct the jury on the definition of true threat to injure Cross violated his First Amendment right because without such a definition, the jury could convict him based on his protected speech, and thus, we hold that the court erred.

"'The First Amendment, applicable to the [s]tates through the Fourteenth Amendment, provides that Congress shall make no law . . . abridging the freedom of speech.'" *State v. Allen*, 176 Wn.2d 611, 626, 294 P.3d 679 (2013) (internal quotation marks omitted) (quoting *Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) (alternation in original). "While the scope of the First Amendment is broad, it does not extend to unprotected speech, one category of which is 'true threats.'" *Allen*, 176 Wn.2d at 626. "A 'true threat' is 'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person.'" *Allen*, 176 Wn.2d at 626 (internal quotation marks omitted) (quoting *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004) (alteration in original)).

True threats are unprotected by the First Amendment because "there is an overriding governmental interest in the 'protect[ion of] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur.'" *Kilburn*, 151 Wn.2d at 43 (alteration in original) (internal quotation marks omitted) (quoting *State v. J.M.*, 144 Wn.2d 472, 478, 28 P.3d 720 (2001)). "The test for determining a 'true threat' is an objective test that focuses on the speaker." *State v. Kohonen*, 192 Wn. App. 567, 575, 370 P.3d 16 (2016) (citing *Kilburn*, 151 Wn.2d at 54). The speaker need not intend to carry out the threat—the question is whether a reasonable person would foresee that one would consider the threat a

serious one. *Schaler*, 169 Wn.2d at 283. Words that seem to be threats but are really "jokes, idle talk, or hyperbole" are not true threats, and therefore cannot be penalized. *Schaler*, 169 Wn.2d at 283. However, in true threat cases,

> it is not just the words and phrasing of the alleged threat that matter, but also the larger context in which the words were uttered, including the identity of the speaker, the composition of the audience, the medium used to communicate the alleged threat, and the greater environment in which the alleged threat was made.

*Kohonen*, 192 Wn. App. at 580. To avoid violating the First Amendment, our Supreme Court has held that it will "interpret statutes criminalizing threatening language as proscribing only unprotected true threats." *Allen*, 176 Wn.2d at 626.

In this case, the trial court's instruction defined "threat" for the cyberstalking and telephone harassment charges as follows:

> [T]o communicate, directly or indirectly, the intent to cause bodily injury in the future to the person threatened or to any other person, to cause physical damage to the property of a person other than the actor, or to do any other act that is intended to harm substantially the person threatened or another with respect to that person's health, safety, business, financial condition, or personal relationships.

CP at 136.

However, the court's instruction erroneously omitted the second paragraph of WPIC 2.24 which defines a "true threat," which pattern jury instruction definition has been amended to match that of "threat." The definition of "true threat" states:

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in [jest or idle talk] [jest, idle talk, or political argument].

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.24, at 80 (4th ed. 2016).

By failing to give the definition of "true threat" for both charges, the jury could potentially have convicted Lewis based on protected speech. Thus, we agree with Lewis that the trial court's instruction was erroneous and that the error constitutes a manifest constitutional error. We next determine whether the instructional error was harmless beyond a reasonable doubt.

D. HARMLESS ERROR

The State argues that the instructional error was harmless beyond a reasonable doubt. We disagree.

We review an erroneous jury instruction for constitutional harmless error. *Lundy*, 162 Wn. App. at 871-72. "We engage in independent review of the record in First Amendment cases 'so as to assure . . . that the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Schaler*, 169 Wn.2d at 282 (internal quotation marks omitted) (quoting *Kilburn*, 151 Wn.2d at 49-50).

The alternative means determination relates to the constitutionally protected right of jury unanimity required under article 1, section 21 of the Washington Constitution. *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). An alternative means crime results from multiple means of proving the charge. *Owens*, 180 Wn.2d at 96. When the State alleges alternative means of proving the crime, the trial court must instruct the jury that it must be unanimous as to the particular alternative means on which it convicts, unless sufficient evidence supports each of the alternative means. In alternative means cases, when substantial evidence supports all alternative means submitted to the jury, unanimity as to the means is not required. *State v. Armstrong*, 188 Wn.2d

333, 340, 394 P.3d 373 (2017).  Conversely, if any of the means rests on insufficient evidence, the constitution demands a particularized expression of jury unanimity.  *State v. Woodlyn*, 188 Wn.2d 157, 165, 392 P.3d 1062 (2017).  This is so because where one of the means submitted to the jury is not supported by sufficient evidence, and the jury does not specify that it unanimously agreed on the other alternative, we face the danger that the jury rested its verdict on an invalid ground.  *Armstrong*, 188 Wn.2d at 343-44.

Here, the to-convict instruction for the cyberstalking charge stated:

To convict the defendant of cyberstalking in Count III, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about January 1, 2016, the defendant made an electronic communication to another person;

(2)  That at the time the defendant made the electronic communication, the defendant intended to harass, intimidate, torment, or embarrass any other person;

(3)  That the defendant:

> (a)  used lewd, lascivious, indecent, or obscene words, images, or language in the electronic communication, or
>
> (b)  *threatened to inflict injury on the person or property of the person to whom the electronic communication was made*; and

(4)  That this act occurred in the State of Washington.

If you find from the evidence that elements (1), (2), and (4), and any of the alternative elements (3)(a) or (3)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.  To return a verdict of guilty, the jury need not be unanimous as to which of the alternatives (3)(a) or (3)(b) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

CP at 134 (emphasis added).

The to-convict jury instruction for the telephone harassment charge stated:

> To convict the defendant of telephone harassment in Count IV, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about January 1, 2016, the defendant made a telephone call to another person;
>
> (2) That at the time the defendant initiated the phone call the defendant intended to harass, intimidate, torment, or embarrass any other person;
>
> (3) That the defendant:
>
> > (a) used lewd, lascivious, indecent, or obscene words or language in the telephone call, or
> >
> > (b) called repeatedly or at an extremely inconvenient hour, whether or not a conversation occurred; or
> >
> > (c) *threatened to inflict injury on the person or property of the person called*; and
>
> (4) That this act occurred in the State of Washington.
>
> If you find from the evidence that elements (1), (2), and (4), and any of the alternative elements (3)(a), (3)(b), or 3(c) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (3)(a), (3)(b), or 3(c) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

CP at 137 (emphasis added).

The parties presume that the cyberstalking and telephone harassment are alternative means crimes. The trial court's to-convict instructions included alternative means for both charges. In each of these charges, there are multiple methods by which one may violate the statute. The disjunctive "or" separates the alternative means in the to-convict instructions for these charges. Each of the subsections in the to-convict instructions describes distinct acts that amount to either cyberstalking or telephone harassment. For example, a person can send an electronic

communication or make a telephone call with intent to intimidate or torment that threatens to inflict injury but without using lewd, lascivious, indecent, or obscene words. One could intend to harass and dispatch repetitive electronic communications without intending to embarrass by sending lewd communications.

Under the jury instructions given, the State was required to prove beyond a reasonable doubt all of the alternative means for the cyberstalking and the telephone harassment charges because the court instructed the jury that the cyberstalking charge and the telephone harassment charge both included alternative means by which the jury could find Lewis guilty. For the cyberstalking charge, the jury could have found Lewis guilty either by finding he (1) used lewd, lascivious, indecent, or obscene words, images, or language in the electronic communication, or (2) threatened to inflict injury on Cross or her property. For the telephone harassment charge, the jury could have found Lewis guilty either by finding he (1) used lewd, lascivious, indecent, or obscene words or language in the telephone call, (2) called repeatedly or at an extremely inconvenient hour, whether or not a conversation occurred, or (3) threatened to inflict injury on Cross or her property.

As discussed above, the trial court failed to instruct the jury on the definition of a true threat for either the cyberstalking or the telephone harassment charges. To compound the error, neither party requested, nor did the court give, an instruction requiring jury unanimity on the particular alternative means it found for the cyberstalking charge or the telephone harassment charge. Instead, the jury returned a general verdict, not a special verdict.[12] Therefore, the remaining issue

---

[12] The jury did return a special verdict finding that Lewis and Cross were members of the same family or household.

is whether the State proved a true threat to injure Cross by Lewis beyond a reasonable doubt for both charges.

1. True Threat Evidence

To determine whether Lewis's conduct or words constituted a true threat to injure and whether the State proved this alternative means as charged, we must conduct a true threat analysis.

Lewis sent text messages to Cross from December 31, 2015[13] at about 12:40 pm to January 1, 2016 at about 8:30 am. In these messages, Lewis told Cross that he and his friends were on their way to see her, and he asked her multiple times if she would like to "f**k" them for money. Lewis also called her obscene names multiple times, and eventually told her they were outside her house.

Lewis then sent Cross a picture of a naked woman. Lewis proceeds to say, "Cause I'm f*****g this then[.] We see your car are you not answering[.] You're done[.] Every guy in forks has seen you[.] Outside your house[.] Hello[.]" Ex. 43. At 8:23 am, Lewis texted, "Kasey we are outside your house want us to come in[.] You better text me or call me in the morning[.]" Ex. 43.

During that time period, Lewis also called Cross 38 times on January 1, 2016, between 2:55 am and 6:11 am, and he left her two voicemails. In the first voicemail, Lewis said,

> One, I just want to say, I love you. I really do, actually. Happy New Year. I don't wish anything bad towards you. I really do love you, even though you're probably out getting f****d by some guy or a couple guys, but I do love you, but I want you to call me today, so yeah, get good rest and call me. All right, love you, bye.

CP at 191; VRP (Mar. 28, 2018) at 482.

---

[13] The information stated the date as on or about January 1, 2016, for both charges.

Lewis left a second voicemail after a man answered his next call to Cross. In the second voicemail, Lewis said,

> Kasey, if you don't call me in the morning when you go to see your kids, we're gonna follow you. I want to know who the f\*\*k was that guy who answered your phone. I don't give a f\*\*k, you call me in the morning when you get this goddamn message, when you go to see your kids or we're gonna follow you when you meet your kids.

CP at 192; VRP (Mar. 28, 2018) at 482.

These words and conduct are not true threats to injure Cross—they are not even threats to inflict bodily injury as required to be proven under the threat alternative means for both charges. Although his words are lude and offensive, Lewis never actually threatened to inflict bodily injury on either Cross or her children as charged by the State.

In its oral argument before us, the State was unable to provide an answer to our questions asking counsel to identify the evidence of a true threat for either charge. The State referred to Lewis's words as "threats to rape" and "gang rape." Wash. Court of Appeals oral argument, *State v. Lewis*, No. 51814-7-II (Oct. 25, 2019), at 18:14, 21:50 (on file with court).

The State argued that Lewis's threats to follow Cross's children in his second voicemail were true threats. The State argues "the threat can be implied by circumstances," and it focuses its true threat argument on Cross's reasonable fear of Lewis, rather than on the correct standard stated in *Allen*—whether a reasonable person in the speaker's position (here Lewis) would foresee that the statement would be interpreted as "a serious expression of intention to inflict bodily harm upon or to take the life of another person" (here Cross or her children). *Allen*, 176 Wn. 2d at 626 (internal quotation marks omitted); oral argument, at 19:00-21:00, 26:00-27:42. Cross's fear of

Lewis is irrelevant because the test for a true threat focuses on the speaker, not the victim. *Allen*, 176 Wn.2d at 626.

Lewis's words did not amount to a direct or an implied threat to "gang rape," as the State argued. While Lewis's words invited Cross to have sex with Lewis and his friends for money, he never said they were going to force her to have sex with them. Nor did he say they would break into her house and physically harm her. And while he did threaten to follow her to her children, that is not a threat to harm her or her children *physically*, which is required under the cyberstalking and telephone harassment statutes and required under the trial court's to-convict instructions for these charges. Therefore, because Lewis's words and conduct were not true threats to injure Cross or her children, we hold that the State failed to prove a true threat by Lewis beyond a reasonable doubt for both of these charges.

2. Error Not Harmless

As discussed above, the trial court did not give a jury instruction or a colloquy regarding jury unanimity. "'Absent some form of colloquy or explicit instruction, we cannot assume that every member of the jury relied solely on the supported alternative.'" *State v. Joseph*, 3 Wn. App. 2d 365, 370, 416 P.3d 738 (2018), *review denied* (quoting *Woodlyn*, 188 Wn.2d at 166).

It is undisputed that there is sufficient evidence to establish that Lewis was guilty of cyberstalking and telephone harassment on the first alternative means charged because his words and the photograph he sent Cross were "lewd, lascivious, indecent, or obscene." CP at 134, 137. However, we cannot be sure that no members of the jury found Lewis guilty based on the other alternative means, threat to inflict injury, for these charges. In light of the vague messages and the lack of anything approaching an explicit threat to inflict injury, we cannot say that the trial court's

failure to give the true threat instruction was harmless beyond a reasonable doubt. *Schaler*, 169 Wn.2d at 288. Lewis's words, while highly offensive, were mostly harassing, intimidating, and sexually explicit. To the extent they could be perceived as threatening, they were too vague for us to be sure that the jury would have necessarily concluded that they were true threats.

Because Lewis's words and conduct were not a true threat to inflict bodily injury on Cross or her children, and because neither party requested, nor did the court give, an unanimity instruction, we hold that the State failed to prove the true threat to injure Cross or her children alternative means for both charges beyond a reasonable doubt. Thus, we reverse Lewis's convictions for cyberstalking and telephone harassment and remand for further proceedings.

## II. GOVERNMENTAL MISCONDUCT

Lewis argues that the trial court erred by denying his CrR 8.3(b) motion to dismiss for governmental misconduct.[14] He argues that the State's late disclosure of the Barnes Report violated its discovery obligations under CrR 4.7 because the report was exculpatory. Lewis further claims that this was prejudicial because he was required to file a motion for a continuance, thereby forcing him to choose between waiving his speedy trial right and his right to a fair trial. Lewis challenges conclusions of law 5 and 6 related to the order denying his motion to dismiss. The State argues that (1) the late disclosure did not constitute a discovery violation, (2) the court found good cause to continue the trial, (3) the Barnes Report was not exculpatory but was, at best, potentially impeaching of Davis, and (4) Lewis failed to exercise due diligence related to the

---

[14] To the extent Lewis argues that the trial court erred by considering the elements of a *Brady* violation during Lewis's motion to dismiss, this error was invited. *State v. Mercado*, 181 Wn. App. 624, 629, 326 P.3d 154 (2014).

report, and thus, he was not prejudiced. We hold that even presuming, but not deciding, that the State's delayed disclosure of the Barnes Report was governmental misconduct, the trial court did not err when it denied Lewis's motion to dismiss because the State's delayed disclosure was not prejudicial.

## A. LEGAL PRINCIPLES

We review a trial court's decision on a CrR 8.3(b) motion to dismiss for a manifest abuse of discretion. *State v. Martinez*, 121 Wn. App. 21, 30, 86 P.3d 1210 (2004). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). A decision is manifestly unreasonable if the trial court, applying the correct legal standard to the facts of the case, adopts a view "'that no reasonable person would take,'" and a decision is based on untenable grounds "'if it rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" *Martinez*, 121 Wn. App. at 30 (internal quotation marks omitted) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

A trial court may "dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice as to the rights of the accused which materially affect the accused's right to a fair trial." CrR 8.3(b). The purpose of this rule is "to protect against surprise that might prejudice the defendant." *State v. Smith*, 67 Wn. App. 847, 851, 841 P.2d 65 (1992).

In order for a court to dismiss criminal charges under CrR 8.3(b), "the defendant must show by a preponderance of the evidence both (1) arbitrary action or governmental misconduct, and (2) actual prejudice affecting the defendant's right to a fair trial." *Martinez*, 121 Wn. App. at 29. The

government's misconduct does not need to be "'of an evil or dishonest nature; simple mismanagement is sufficient.'" *State v. Michielli*, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997) (emphasis omitted) (quoting *Blackwell*, 120 Wn.2d at 831). The alleged governmental misconduct must have "materially affected the defendant's right to a fair trial." *State v. Brooks*, 149 Wn. App. 373, 389, 203 P.3d 397 (2009). Dismissal is "an extraordinary remedy used only in truly egregious cases." *State v. Flinn*, 119 Wn. App. 232, 247, 80 P.3d 171 (2003), *aff'd*, 154 Wn.2d 193, 110 P.3d 748 (2005).

## B.  NO PREJUDICE

Lewis argues that the late disclosure of the Barnes Report prejudiced him because he was required to move for a continuance of trial, thereby forcing him to choose between his right to a speedy trial and his right to a fair trial.[15] The State argues that by counsel requesting a continuance, Lewis waived any objection to the continuance which he sought so that his counsel could file a motion to dismiss. The State also argues that there was ample time to prepare for trial and there was no need to continue the trial beyond the speedy trial deadline of February 22, 2018, although the trial court found good cause to do so. We hold that there was good cause for a continuance, and thus, Lewis's claim on this basis fails.

A defendant held in custody pending trial must be tried within 60 days of arraignment. CrR 3.3(b)(1)(i), CrR 3.3(c)(1). However, CrR 3.3(f)(2) allows the trial court to continue the trial date "when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." The decision to grant or deny a motion to

---

[15] Upon learning of the Barnes Report, Lewis requested a trial continuance to move for dismissal, which request the court granted.

continue lies within the sound discretion of the trial court and will not be disturbed absent a showing that it was manifestly unreasonable or based on untenable grounds or reasons. *State v. Kenyon*, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009). In granting a motion to continue the trial under CrR 3.3(f)(2), a motion for continuance "by or on behalf of any party waives that party's objection to the requested delay."

Here, on February 9, 2018, defense counsel requested a continuance of the trial until March 26, and it is undisputed that Lewis requested a continuance to file a motion to dismiss, not to give his attorney time to prepare for trial in light of the newfound evidence. Under CrR 3.3, the court properly found good cause to grant the continuance to March 26, beyond the speedy trial deadline of February 22, under the circumstances and given the multiple continuances granted previously, many at Lewis's request. Under CrR 3.3(f)(2), Lewis waived any objection to the continuance, and even if not waived, the trial court properly found good cause to grant a several-week continuance to March 26, 2018, beyond the speedy trial deadline of February 22.

Because Lewis waived any objection to the continuance, the continuance was supported by good cause, and Lewis was not prejudiced by the continuance, we hold that Lewis's claim fails.

III. CELL PHONE RECORDS

Lewis next argues that the trial court erred by admitting his cell phone records because they were not properly authenticated and their admission prejudiced him. The State argues that the trial court did not abuse its discretion by admitting the cell phone records because they were properly authenticated. We agree with the State.

We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. *State v. Horn*, 3 Wn. App. 2d 302, 310, 415 P.3d 1225 (2018). The trial court has wide

30

discretion in choosing which exhibits to admit. *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984). "A court abuses its discretion 'only if no reasonable person would take the view adopted by the trial court.'" *State v. Wooten*, 178 Wn.2d 890, 897, 312 P.3d 41 (2013) (quoting *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d. 1258 (1979)). A trial court's evidentiary error that results in prejudice to the defendant is grounds for reversal. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). "[E]rror is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

ER 901 requires a preliminary finding that evidence is authentic before it is admissible. It states, "[t]he requirement of authenticity or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." ER 901(b) provides a non-exclusive list of ways the proponent can establish its authenticity, including testimony that it is what it is claimed to be by a witness with knowledge. The proponent of the evidence satisfies ER 901 if it "introduces sufficient proof to permit a reasonable juror to find in favor of authenticity or identification." *State v. Payne*, 117 Wn. App. 99, 106, 69 P.3d 889 (2003). ER 901 merely requires "'some evidence'" to establish that the evidence is what the proponent claims it to be. *Payne*, 117 Wn. App. at 106 (quoting *United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989)).

Ninete testified that he acted as "the custodian of records for all [Verizon's] records and had been working for Verison for five years." VRP (Apr. 2, 2018) at 650. Ninete testified that he was familiar with how Verizon collects data and he testified extensively regarding the process. VRP (Apr. 2, 2018) at 684 (testifying that he had testified "over 1,000" times). Ninete testified

that he recognized the records related to Lewis's account because of the format and contents of the document, and because it was consistent with the types of documents typically sent in response to subpoenas. The trial court also asked Ninete questions regarding his knowledge of the particular documents to determine authenticity.

Lewis objected to these records being admitted. Lewis argues that there was nothing unique about the Verizon documents from any other Excel spreadsheet. However, the bar for authenticity is low, requiring only "'some evidence.'" *Payne*, 117 Wn. App. at 106 (quoting *Jimenez Lopez*, 873 F.2d at 772).

The State laid an extensive foundation with Ninete to establish that the documents were what the State purported them to be. Ninete had substantial experience with these particular types of records, responding to subpoenas about three times per week. Ninete explained in detail his experience and knowledge of the documents.

We hold that the trial court did not abuse its discretion by admitting Lewis's cell phone records after finding they were authenticated.

IV. CONSTITUTIONALITY OF RCW 9.61.260—CYBERSTALKING STATUTE.

Lewis argues that RCW 9.61.260 "includes prohibitions on 'lewd, lascivious, indecent, or obscene' communications made with intent to 'harass' or 'embarrass.'" Br. of Appellant at 29.[16] The State argues the statute is not unconstitutional because its language closely mirrors the

---

[16] Lewis does not argue that the section of the statute prohibiting threats is unconstitutional.

language in the telephone harassment statute—RCW 9.61.230—which has been upheld as constitutional.[17] We agree with the State.

We review de novo an allegation of a constitutional violation. *State v. Vance*, 168 Wn.2d 754, 759, 230 P.3d 1055 (2010). We presume a statute is constitutional; the party challenging a statute's constitutionality bears the burden of proving the statute's unconstitutionality beyond a reasonable doubt. *State v. Batson*, 9 Wn. App. 2d 546, 550, 447 P.3d 202 (2019), *review granted*, 194 Wn.2d 1009.

The telephone harassment statute, RCW 9.61.230, has been upheld against constitutional challenges. *State v. Alexander*, 76 Wn. App. 830, 843, 839, 888 P.2d 175 (1995) ("the statute before us primarily regulates conduct, with minimal impact on speech" and "the statutory provision . . . receives minimal constitutional protection"). Because the telephone harassment statute has already been upheld as constitutional, and because the cyberstalking statute which Lewis challenges is identical in its scope and proscribed conduct, we hold that RCW 9.61.260 is constitutional. *Alexander*, 76 Wn. App. at 830.

## V. LFOs

Finally, Lewis argues that the trial court erred by imposing various LFOs: a $100 crime laboratory fee, a $100 DNA collection fee, a $500 court appointed counsel reimbursement fee, a $200 criminal filing fee, and a $100 domestic violence assessment. Lewis argues that the 2018

---

[17] Recently, the federal district court in the Western District of Washington held that other provisions of RCW 9.61.260(1)(b), not at issue here, were overbroad and vague. *Rynearson v. Ferguson*, 355 F. Supp. 3d 964, 972 (W.D. Wa. 2019). *Rynearson* does not affect this case because it is not binding on our court.

legislative amendments to the LFO statutes apply and that because he was found indigent for trial and for appeal under RCW 10.01.160(3)(d), the court erred by imposing certain LFOs.[18] Lewis also argues that the court erred by imposing the DNA collection fee because he had a prior felony conviction. We agree and hold that the court erred by imposing these LFOs without conducting a proper inquiry under the current statutes, and thus, we reverse the imposed LFOs.

The legislature amended former RCW 10.01.160(3) (2015), and as of June 7, 2018, this statutory provision limits the type of LFOs a trial court can impose on an indigent defendant and prohibits a trial court from ordering a defendant to pay costs "if the defendant at the time of sentencing is indigent as defined in RCW 10.101.010(3)(a) through (c)." RCW 10.01.160(3). However, when a defendant is not indigent as defined in RCW 10.01.010(3)(a) through (c), the trial court is required to consider the defendant's financial resources and the nature of the burden the payment of LFOs will impose before determining the amount and method of payment of costs. RCW 10.01.160(3).

RCW 10.101.010(3) defines four categories of "indigent." Subsection (a) describes people who receive certain types of public assistance. Subsection (b) defines indigent as a person who is "involuntarily committed to a public mental health facility." Subsection (c) states a person who receives "an annual income, after taxes, of one hundred twenty-five percent or less of the federal poverty level" is indigent. When a defendant is indigent based on subsection (a), (b), or (c), the trial court is prohibited from imposing costs as defined in RCW 10.01.160(3). Subsection (d)

---

[18] Enacted Second Substitute House Bill 1783, effective June 7, 2018, amended several statutes related to the imposition of LFOs on indigent defendants and interest on such costs, nonrestitution, and fees. *See* LAWS OF 2018, ch. 269.

defines indigent as a person who is unable to pay the cost of legal counsel for the proceeding before the court. However, a trial court is not precluded from imposing costs against a defendant determined to be indigent under subsection (d). RCW 10.01.160(3).

In 2018, the legislature amended former RCW 43.43.7541 (2015) to authorize the imposition of a DNA collection fee only if the State has not "previously collected the offender's DNA as a result of a prior conviction." LAWS OF 2018, ch. 269, § 18. This statutory amendment applies here because Lewis's case was pending on review when the new legislation came into effect. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). A defendant is required to submit a DNA sample for any adult or juvenile felonies. RCW 43.43.754(1)(a). However, a defendant is not required to submit a DNA sample if the Washington state patrol crime laboratory already has one from the individual for a qualifying offense. RCW 43.43.754(4).

The trial court did not use these criteria to determine whether Lewis is indigent under the current statutes before imposing certain LFOs. Nor did the court require the State to prove that Lewis had previously provided a DNA sample prior to imposing a DNA collection fee. Based on these errors, we remand for the trial court to reconsider the imposition of LFOs. On remand, the court should consider all of the LFOs in light of the applicable statutes. LAWS of 2018, ch. 269; *Ramirez*, 191 Wn.2d 750; *State v. Houck*, 9 Wn. App. 2d 636, 651 n.4, 446 P.3d 646 (2019) (for defendants with prior felony convictions, the State bears the burden of proving that it has not previously collected the defendant's DNA), *review denied*; *State v. Smith*, 9 Wn. App. 2d 122, 127-28, 442 P.3d 265 (2019) (RCW 10.99.080 does not prohibit the imposition of the domestic violence assessment against indigent defendants, but it does encourage the trial courts to inquire into whether the imposition will impact the victim).

CONCLUSION

We hold that (1) the trial court erred by failing to provide the jury with an instruction defining true threat, and this error was not harmless beyond a reasonable doubt, (2) the trial court did not err by denying Lewis's motion to dismiss, (3) the trial court did not err by admitting the Verizon Wireless documents, and (4) RCW 9.61.260 is not unconstitutional. As to the LFOs, we hold that (5) the court erred by imposing them without conducting a proper inquiry under the current statutes. Thus, we affirm the convictions for arson and residential burglary, but we reverse Lewis's convictions for cyberstalking and telephone harassment and remand for further proceedings. We reverse the LFOs and remand for the court to conduct a proper inquiry under the current LFO statutes prior to imposing LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, P.J.

We concur:

GLASGOW, J.

CRUSER, J.